**Case No. 26-6052**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

MEGAN HSIEH
Appellee/Plaintiff,

v.

DAVID A. SURRATT, KALYN CAVAZOS, and
TERRY SCHOFIELD
Appellant/Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
HONORABLE BERNARD M. JONES, DISTRICT JUDGE
Case No. CIV-2025-1160-J

**APPELLANTS' BRIEF**

DATED: May 4, 2026      M. Daniel Weitman, OBA #17412
C.B. Moore, OBA #31653
University of Oklahoma
Office of Legal Counsel
660 Parrington Oval, Rm. 213
Norman, OK 73019
(405) 325-4124
dan.weitman@ou.edu
cbmoore@ou.edu
**Attorneys for Defendants/Defendants**

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................III

STATEMENT OF PRIOR OR RELATED APPEALS ...............................................1

STATEMENT REGARDING ORAL ARGUMENT................................................1

JURISDICTIONAL STATEMENT .......................................................................2

STATEMENT OF THE ISSUES ...........................................................................3

STANDARD OF REVIEW ...................................................................................3

STATEMENT OF THE CASE...............................................................................5

    I.   Factual Background ................................................................................5

    II.  The Disciplinary Proceeding .................................................................7

    III.   Proceedings Below.............................................................................9

SUMMARY OF ARGUMENT..............................................................................11

ARGUMENT ......................................................................................................13

    I.   Plaintiff's Allegations, Accepted as True, Do Not Establish a First Amendment Violation..............................................................................13

        A.  *Counterman* does not apply in the factual situation presented. .................13

        B. Even if *Counterman* applies, Plaintiff has failed to demonstrate a constitutional violation because Plaintiff's own pleadings demonstrate the subjective intent necessary to satisfy *Counterman's* requirements...................20

            1.   The Student Code provision mirrors *Counterman's* own definition of true threats.................................................................................................20

            2.   Plaintiff's own statements, accepted as true, demonstrate that she consciously disregarded the risk that her words would be perceived as threatening. ............................................................................................21

            3.   Plaintiff's expectation of 988 confidentiality is irrelevant to the recklessness inquiry. ................................................................................24

        C.   The district court failed to consider the acts of each Defendant to identify what constitutional violation, if any, they may have committed. ....................26

II. Qualified Immunity Should be Granted Because the Law is not Clearly Established .................................................................................................30

    A. The Clearly Established Standard ...........................................................31

    B. *Counterman* did not clearly establish that its subjective recklessness standard governs university student discipline. ................................................33

    C. The competing doctrinal frameworks for a university's student conduct discipline confirm that no clearly established rule existed. ..............................38

    D. The district court's own treatment of the claim underscores the doctrinal uncertainty. .....................................................................................................41

    E. The "obvious clarity" exception cannot rescue the district court's analysis. ........................................................................................................43

CONCLUSION.............................................................................................48

Order Granting in Part and Denying in Part Defendants' Motion to Dismiss .........52

Order Denying Plaintiff's Motion for Preliminary Injunction ...............................75

# <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Agnosti v. Felton*,
521 U.S. 203, 117 S. Ct. 1997, 138 L.Ed.2d 391 (1997) .....................................19

*Apple Inc. v. NLRB*,
143 F.4th 291 (5th Cir. 2025) ...............................................................................35

*Ashcroft v. al-Kidd*,
563 U.S. 731, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)............................. 31, 46

*Behrens v. Pelletier*,
516 U.S. 299, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996) .....................................2, 4

*Bethel School Dist. No. 403 v. Fraser*,
478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986) ......................................40

*Boim v. Fulton Cnty. Sch. Dist.*,
494 F.3d 978 (11th Cir. 2007)..............................................................................17

*Brandenburg v. Ohio*,
395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) .........................................16

*Butz v. Economou,*
438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) .........................................27

*C1.G v. Siegfried*,
38 F.4th 1270 (10th Cir. 2022) ...........................................................................39

*Cleavinger v. Saxner*,
474 U.S. 193, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985) .........................................27

*Colbruno v. Kessler*,
928 F.3d 1155 (10th Cir. 2019)............................................................ 12, 43, 45

*Counterman v. Colorado*,
600 U.S. 66, 143 S.Ct. 2106, 216 L.Ed.2d 775 (2023) ....1, 3, 9-16, 17, 19, 20-26,
29-31, 33-38, 41-44, 47

*Cruz v. City of Laramie*,
239 F.3d 1183 (10th Cir. 2001)..................................................................3

*Cummings v. Dean*,
913 F.3d 1227 (10th Cir. 2019)................................................................32

*D.J.M. ex rel. D.M. v. Hannibal Public School District No. 60*,
647 F.3d 754 (8th Cir. 2011)...................................................................25

*Damsky v. Summerlin*,
810 F.Supp.3d 1258 (N.D. Fla. 2025) ........................................................34

*Damsky v. Summerlin*,
No. 25-14171, 2026 WL 75122 (11th Cir. Jan. 8, 2026)............. 12, 17, 33, 38, 39

*Denno v. Sch. Bd. of Volusia Cnty.*,
218 F.3d 1267 (11th Cir. 2000)................................................................42

*District of Columbia v. Wesby*,
583 U.S. 48, 138 S.Ct. 577, 199 L.Ed.2d 453 (2018) .........................................44

*Dodds v. Richardson*,
614 F.3d 1185 (10th Cir. 2010)..................................................................4

*Doe v. University of Massachusetts*,
145 F.4th 158 (1st Cir. 2025).............................................................. 17, 38

*Elder v. Holloway*,
510 U.S. 510, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994) ........................................4

*Elonis v. United States*,
575 U.S. 723, 135 S.Ct. 2001, 192 L.Ed.2d 1 (2015) .........................................44

*Estate of B.I.C. v. Gillen*,
761 F.3d 1099 (10th Cir. 2014)...............................................................32

*Fogarty v. Gallegos*,
523 F.3d 1147 (10th Cir. 2008)..............................................................4

*Ford v. McKesson*,
171 F.4th 332 (5th Cir. 2026) ........................................... 15, 34, 36, 37

*Frasier v. Evans*,
992 F.3d 1003 (10th Cir. 2021)..............................................................46

*Harlow v. Fitzgerald*,
457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ........................................46

*Hartman v. Moore*,
547 U.S. 250, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006) ........................................48

*Hazelwood School Dist. v. Kuhlmeier*,
484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) ..........................................40

*Healy v. James*,
408 U.S. 169, 180, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972) .................................14

*Hope v. Pelzer*,
536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) ........................................43

v

*Horwitz v. State Bd. of Medical Examiners of State of Colo.*,
  822 F.2d 1508 (10th Cir. 1987)................................................................27

*Hunt v. Board of Regents of University of New Mexico*,
  792 Fed. App'x 595 (10th Cir. 2019) ........................................... 14, 40

*In re Rendelman*,
  129 F.4th 248 (4th Cir. 2025) ................................................................36

*Irizarry v. Yehia*,
  38 F.4th 1282 (10th Cir. 2022) ..............................................................45

*Johnson v. Jones*,
  515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995) ...................2, 4

*Kerns v. Bader*,
  663 F.3d 1173 (10th Cir. 2011) ................................................................4

*Leroy v. Livingston Manor Central School District*,
  158 F.4th 414 (2d Cir. 2025)..................................................................34

*Lincoln v. Maketa*,
  880 F.3d 533 (10th Cir. 2018)................................................................47

*Lowe v. Raemisch*,
  864 F.3d 1205 (10th Cir. 2017)..............................................................45

*Luethje v. Kyle*,
  131 F.4th 1179 (10th Cir. 2025)..........................................................1, 45

*Mahanoy Area School District v. B. L. by and through Levy*,
  594 U.S. 180, 141 S.Ct. 2038, 210 L.Ed.2d 403 (2021) .... 1, 12, 13, 18, 19, 40-42

VI

*Malley v. Briggs*,
   475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) ...............................32

*Matthews v. Bergdorf*,
   889 F.3d 1136 (10th Cir. 2018).............................................................28

*McKesson v. Doe*,
   144 S.Ct. 913, 218 L.Ed.2d 442 (2024) ...................................... 35, 36

*Medina v. Cram*,
   252 F.3d 1124 (10th Cir. 2001)...............................................................31

*Mitchell v. Forsyth*,
   472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)....................................2, 22

*Mullenix v. Luna*,
   577 U.S. 7, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015) ..................................... 31, 32

*Pahls v. Thomas*,
   718 F.3d 1210 (10th Cir. 2013)................................................................28

*Papish v. Board of Curators of University of Missouri*,
   410 U.S. 667, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973) .................................. 14, 40

*Pearson v. Callahan*,
   555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) ........................... 4, 13, 31

*Pompeo v. Board of Regents of the University of New Mexico*,
   852 F.3d 973 (10th Cir. 2017)................................................................46

*Ponce v. Socorro Independent School District*,
   508 F.3d 765 (5th Cir. 2007).................................................... 25, 41

*R.W. v. Columbia Basin College*,
  No. 18-CV-05089-MKD, 2025 WL 1693554 (E.D. Wash. June 16, 2025) . 17, 35, 38

*Radwan v. Manuel*,
  55 F.4th 101 (2d Cir. 2022)...................................................................... 39, 40

*Rosales v. Bradshaw*,
  72 F.4th 1145 (10th Cir. 2023)........................................................................45

*Sanchez v. Guzman*,
  105 F.4th 1285 (10th Cir. 2024) ........................................... 1, 32, 43, 44

*Sealed Plaintiff 1 v. Front*,
  No. 22-CV-00670, 2024 WL 1395477 (E.D. Va. Mar. 31, 2024) ........................35

*Shepherd v. Robbins*,
  55 F.4th 810 (10th Cir. 2022) ........................................................................43

*Slaughter v. Brigham Young University*,
  514 F.2d 622 (10th Cir. 1975)................................................... 12, 14, 42

*Stewart v. Donges*,
  915 F.2d 572 (10th Cir. 1990)........................................................................2

*Tachias v. Sanders*,
  130 F.4th 836 (10th Cir. 2025) ........................................................................4

*Taylor v. Roswell Independent School District*,
  713 F.3d 25 (2013)........................................................................18

*Thompson v. Ragland*,
  23 F.4th 1252 (10th Cir. 2022) ................................................... 14, 39

*Tinker v. Des Moines Independent Community School Dist.*,
  393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) ....1, 12, 13, 17-20, 33, 38-42,
  44

*Virginia v. Black*,
  538 U.S. 343, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) ......................................20

*West v. Derby Unified School District*,
  206 F.3d 1358 (10th Cir. 2000)...............................................................18

*White v. Stone*,
  No. 21-CV-1207-SCY-JFR, 2023 WL 7165190 (D.N.M. 2023)..........................48

*Wood v. Strickland*,
  420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) ............................................27

*Yeasin v. Durham*,
  224 F. Supp. 3d 1194 (D. Kan. 2016)...................................................39

*Zorn v. Linton*,
  146 S.Ct. 926 (2026)........................................................ 43, 44

**Oklahoma Statutes**

43A O.S. §1-109...............................................................................26

59 O.S. §1376..................................................................................26

**Other Authorities**

*Mens rea*, Black's Law Dictionary, (12th ed. 2024) ...............................................15

*Tarasoff v. Regents of Univ. of California*,
  551 P.2d 334 (Cal. 1976) .......................................................8, 11, 24

**STATEMENT OF PRIOR OR RELATED APPEALS**

Pursuant to 10th Cir. R. 28.2(C)(3), counsel states that there are related appeals in this Court. The related appeals are as follows:

26-6063, Hsieh v. Board of Regents for the University of Oklahoma, et al; and

26-6070, Hsieh v. Board of Regents for the University of Oklahoma, et al.

**STATEMENT REGARDING ORAL ARGUMENT**

The Appellants (Defendants below) respectfully request oral argument. This appeal presents legal questions of first impression concerning the applicability of *Counterman v. Colorado*, 600 U.S. 66, 143 S.Ct. 2106, 216 L.Ed.2d 775 (2023), to administrative university disciplinary proceedings; the interaction between the true-threats doctrine and the *Tinker*/*Mahanoy* framework for university student speech, and the scope of the "obvious clarity" exception following this Court's recent decisions in *Sanchez v. Guzman*, 105 F.4th 1285 (10th Cir. 2024), and *Luethje v. Kyle*, 131 F.4th 1179 (10th Cir. 2025). *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *Mahanoy Area School District v. B. L. by and through Levy*, 594 U.S. 180, 141 S.Ct. 2038, 210 L.Ed.2d 403 (2021). Oral argument would materially assist the Court in evaluating these intersecting doctrinal questions.

# JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 over Appellee's (Plaintiff below) claim under 42 U.S.C. § 1983 for violation of the First Amendment, which is the only claim at issue in this appeal.

This Court has jurisdiction over this interlocutory appeal under 28 U.S.C. § 1291 and the collateral order doctrine. The district court's March 13, 2026, order denied qualified immunity to the Defendants on Plaintiff's First Amendment claim. A denial of qualified immunity is immediately appealable to the extent it turns on an issue of law. *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Stewart v. Donges*, 915 F.2d 572, 575 (10th Cir. 1990). The Defendants challenge the district court's legal conclusions that the alleged conduct violated the First Amendment and that the right at issue was clearly established at the time of the conduct. The Court's review is confined to those legal questions, accepting as true the factual allegations in the Amended Complaint. *Johnson v. Jones*, 515 U.S. 304, 313, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995); *Behrens v. Pelletier*, 516 U.S. 299, 313, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996).

The district court entered the order under review on March 13, 2026. The Defendants filed a timely notice of appeal on March 23, 2026, within thirty days of entry of the order. Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF THE ISSUES

First, whether the allegations in the First Amended Complaint, accepted as true, establish a First Amendment violation, where *Counterman's* applicability to non-criminal university discipline remains an open constitutional question, and where the Student Code provision the officials enforced tracks *Counterman's* true-threats definition by the district court's own finding, and where Plaintiff's own statements and her acknowledgment of the duty-to-warn framework demonstrate awareness that her words carried a threatening quality.

Second, whether the district court erred in denying qualified immunity by holding that the law was clearly established in May 2024 that *Counterman v. Colorado*, 600 U.S. 66, imposes a subjective recklessness standard on a public university's discipline of a student for threatening speech, where the district court found it to be a "close case", where no federal court of appeals has extended *Counterman* beyond criminal prosecution, and where the circuits disagree on which doctrinal framework governs university student speech of this character.

## STANDARD OF REVIEW

This Court reviews the denial of qualified immunity de novo. *Cruz v. City of Laramie*, 239 F.3d 1183, 1187 (10th Cir. 2001). Interlocutory jurisdiction, however, is limited. The Court may review whether the facts the district court took as true demonstrate a violation of clearly established law, but it may not revisit the

sufficiency of the evidence supporting the district court's factual assumptions. *Johnson v. Jones*, 515 U.S. at 319-20; *Tachias v. Sanders*, 130 F.4th 836, 842, n.3 (10th Cir. 2025). The existence of material factual disputes does not bar a purely legal interlocutory appeal. *Behrens v. Pelletier*, 516 U.S. at 313.

Qualified immunity analysis proceeds in two steps, and either prong may resolve the appeal. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The two prongs may be taken in any order. *Dodds v. Richardson*, 614 F.3d 1185, 1192 (10th Cir. 2010); *Kerns v. Bader*, 663 F.3d 1173, 1181 (10th Cir. 2011) (synthesizing the reasons for the court to consider the "clearly established" prong first). Although the factual findings and assumptions identified by the district court define the universe of facts for appellate review, *Fogarty v. Gallegos*, 523 F.3d 1147, 1154 (10th Cir. 2008), this Court exercises de novo review over the legal questions of whether those facts demonstrate a constitutional violation and whether the right was clearly established. Review is not confined to the authorities cited below; this Court may consider all relevant precedent in determining whether the law was clearly established. *Elder v. Holloway*, 510 U.S. 510, 516, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994).

**STATEMENT OF THE CASE**

## I.      Factual Background

On April 27 and on May 1, 2024, Plaintiff placed two calls to the 988 Suicide and Crisis Lifeline. [App. Vol. I at 012.] During those calls, she described acute mental distress and made statements that the 988 counselors documented and escalated within the university system. On the second call, the counselor's supervisor spoke with Plaintiff and then contacted the University of Oklahoma Health Sciences Center Police (OUHSC). [App. Vol. I at 020.] In the days that followed, Plaintiff's statements were the subject of communications among 988 personnel, OUHSC Police, and University officials charged with responding to potential threats against the campus community.

Plaintiff's statements included (a) she "wished that [Kate Stanton, an administrator at the University] would die" and that she wanted other administrative staff at the medical school to die; (b) "I am so tired and done; I want to rip my head off" and "leave a note to the news at the school and let them know that it's this place's fault and destroy the school in the process;" (c) "I want to end it all at the school, five minutes before post it to the news, tell other med schools, and take the administration with me;" (d) "[I want to] yeet off the planet and yeet them [the administrators] too;" and (e) "I want her [Kate Stanton] to pay in one way or another,

5

and I want the school to pay in one way or another." [App. Vol. I at 013-014, 031-032, 131-44; Vol. III at 633].

On May 1, 2024, following a request by Defendant, Terry Schofield, Deputy Chief of OUHSC Police, a 988 counselor placed a follow-up call to Plaintiff. [App. Vol I at 018]. Plaintiff alleged that she "would never have made [her May 1] statements . . . if not prompted by the 988 counselor." *Id.* During that call, when asked whether her distress had produced harmful thoughts, Plaintiff responded, "No. Sure as hell did the day that I called." [App. Vol. I at 138]. She then described wanting to "end it all at the school" in language substantially similar to her April 27 statements. [App. Vol. I at 139]. The counselor reported those statements back to Schofield. [App. Vol I at 147].

Schofield shared the information from the 988 calls with the University's Threat Assessment Review Committee (TARC), which in turn notified the University's NABITA[1]-certified Behavioral Intervention Team (BIT). [App. Vol. I at 021]. In response to the reported statements, officials instituted safety protocol measures. Plaintiff was assessed at the "critical" level on the SIVRA-35 threat assessment rubric, the standardized tool used by the BIT. [App. Vol. II at 286-290]. Upon learning of the May 1 statements, University officials immediately contacted Kate Stanton to determine her location and arranged for a police escort to return her

---

[1] https://www.nabita.org (last accessed May 4, 2026)

to the Student Union building. [App. Vol. II at 289]. The school then sent nonessential staff home, locked the administrative office suite, and enacted card-ID-only access to the Student Union to control entry and exit. *Id.* The school cancelled a graduation event for seniors scheduled for that evening near the building and convened an emergency TARC meeting at 4:30 that afternoon. *Id.* Based on the content of the 988 calls and the assessments of the 988 supervisor and University Police, the University's Office of Student Conduct initiated disciplinary proceedings under Section II.4(e), Disorderly Conduct and Unwanted Behaviors – Threatening behavior, of the Student Rights and Responsibilities Code. [App. Vol. I at 050, 067]. The charging document identified Plaintiff's April 27 and May 1 statements as the conduct at issue. [App. Vol. I at 067].

## II. The Disciplinary Proceeding

Plaintiff requested a formal hearing following the Office of Student Conduct's initial sanction of expulsion. [App. Vol II at 396]. This is permitted by University rules governing student conduct. [App. Vol. I at 063-066]. The hearing was convened on June 4, 2024, over a period of approximately three and a half hours. [App. Vol. II at 209]. Plaintiff appeared personally and was represented by counsel, as did the Office of Student Conduct. [App. Vol. II at 396]. A member of the Office of Legal Counsel served as independent counsel to the Hearing Panel, which consisted of two faculty/staff members and a student representative. *Id* at 396. The panel heard

testimony from Schofield, Harrington, and a witness presented by Plaintiff. *Id.* Plaintiff also testified at the hearing. The parties exchanged evidence in advance, cross-examined witnesses, and raised objections during the proceeding. [App. Vol. II at 209 et seq.].

At the hearing, Plaintiff testified about her understanding of the *Tarasoff* duty-to-warn framework, describing her direct experience with it during her psychiatric rotation. *See Tarasoff v. Regents of Univ. of California*, 551 P.2d 334 (Cal. 1976). Asked whether she had expected her 988 call to reach her school, she answered that she had not, and she distinguished her statements from the kind of "grudgingly brought in" patient she had seen during her rotation who had said, "he was going to shoot his roommate at 5:00 p.m. tomorrow when he came home from work with his gun." [App. Vol. II at 353].

The Hearing Panel issued written findings on June 7, 2024. [App. Vol. II at 396]. Applying a preponderance-of-the-evidence standard, the panel found Plaintiff "responsible for the prohibited student conduct of threatening behavior in violation of Section II.4(e) of the Student Rights and Responsibilities Code." *Id.* The panel explained that it found the undisputed words used by Ms. Hsieh in a 988 call to be compelling on the question of responsibility, while concluding that the evidence did not support a finding that Plaintiff "used the word 'kill' or implied the word 'kill'" specifically. *Id.* The panel characterized Plaintiff's statements as passive threatening

ideations made while she was in an emotional crisis and mitigated the proposed sanction from expulsion to a period of suspension. *Id.*

The Plaintiff and the Office of Student Conduct both appealed the panel's findings. [App. Vol. II at 398, 400]. Defendant, David Surratt, Vice President for Student Affairs, conducted the appellate review of the panel's decision. [App. Vol. II at 400]. Neither the issue of free speech nor the issue of a true threat assessment under *Counterman* was ever raised before Surratt. [App. Vol. II at 224-29, 360-67 (no party raised free speech or *Counterman* during hearing); App. Vol II at 400-02 (Surratt decision omitting same)]. Surratt affirmed the panel's finding that Plaintiff was responsible for Disorderly Conduct and Unwanted Behaviors – Threatening behavior under Section II.4(e) of university policy and addressed the sanction on the record the panel had compiled. *Id.*

### III. Proceedings Below

Plaintiff filed this action on October 6, 2025, and filed an Amended Complaint on November 14, 2025, asserting a First Amendment claim under 42 U.S.C. § 1983 against the University, Surratt, Cavazos, in their individual and official capacities, and Schofield in his individual capacity (Count I), along with claims for vagueness (Count II), due process (Count III), and violation of Section 504 of the Rehabilitation Act (Count IV). [App. Vol. I at 007]. Defendants moved to dismiss on November 24, 2025, raising qualified immunity and, for Cavazos and Surratt, absolute quasi-

judicial immunity. [App. Vol. III at 406]. The parties briefed the motion through January 12, 2026. [App. Vol. III at 437, 477]. Separately, on February 8, 2026, Plaintiff moved for a preliminary injunction [App. Vol. III at 489], to which Defendants responded [App. Vol. III at 559], and Plaintiff replied [App. Vol. III at 604].

On March 13, 2026, the district court issued two orders. In the order under review here, the court granted the Defendant's Motion to Dismiss in part and denied it in part. [App. Vol. III at 632]. The court dismissed Counts II, III, and IV entirely, and dismissed Count I as against the University, while allowing the First Amendment claim to proceed against the Individual Defendants in their individual and official capacities. *Id.* Although the Court stated it was a "close case" [App. Vol. III at 645], the court denied qualified immunity on the First Amendment claim, analyzing the claim exclusively under *Counterman*. The same day, the district court entered a separate order denying Plaintiff's Motion for Preliminary Injunction. [App. Vol. III at 655]. Again, stating that the constitutional question is a "close case" and then applying a different analytical framework, the court found "it is undisputed that Plaintiff's speech caused tangible disruption" and concluded that Plaintiff was unlikely to succeed on the merits. [App. Vol. III at 659-660].

Individual Defendants filed a timely notice of appeal on March 23, 2026, invoking this Court's jurisdiction over the denial of qualified immunity under the collateral order doctrine. [App. Vol. III at 666].

## SUMMARY OF ARGUMENT

The district court erred in two distinct ways when it denied qualified immunity to the Defendants on Plaintiff's First Amendment true-threats claim.

First, Plaintiff's allegations, accepted as true, do not establish a constitutional violation. If *Counterman* does not apply to civil discipline, the subjective-intent question central to Plaintiff's claim is immaterial, and the analysis proceeds under an objective disruption framework that the record readily satisfies. If *Counterman* does apply, the Student Code provision that the officials enforced mirrors its definition of true threats by the district court's own finding. [App. Vol. III at 649]. As to the recklessness inquiry, Plaintiff's own statements, including her acknowledgment of the *Tarasoff* duty-to-warn framework from her psychiatric training, demonstrate awareness that her words carried a threatening nature. Officials who began student conduct disciplinary actions based on reports from a 988 supervisor, a deputy police chief, and the University's Behavioral Intervention Team, addressed through a formal hearing, did not violate Plaintiff's First Amendment rights.

11

Second, the court erred when, even though it recognized that the constitutional issue was a "close case", it held that in May 2024, the law was clearly established that *Counterman*, a criminal true-threats decision, governs administrative university disciplinary proceedings. No federal court of appeals has held that Counterman's subjective recklessness standard governs university disciplinary proceedings. The Eleventh Circuit declined to reach the question in *Damsky v. Summerlin*, No. 25-14171, 2026 WL 75122 (11th Cir. Jan. 8, 2026), applying *Tinker* instead even in a preliminary posture, and other courts deciding the issue have declined to adopt *Counterman* as a school-discipline prerequisite.

The circuits that have addressed threatening speech at a university have chosen different analytical frameworks altogether, and the district court's own orders illustrate the difficulty. On March 13, 2026, the order under review analyzed the claim solely through *Counterman*, while a companion order issued the same day applied *Tinker*, *Mahanoy*, and *Slaughter v. Brigham Young University*, 514 F.2d 622 (10th Cir. 1975), finding it "undisputed that Plaintiff's speech caused tangible disruption." [App. Vol. III at 660]. When the governing framework itself remains contested, the "obvious clarity" exception cannot apply, because that exception fails "when there are any relevant ambiguities" about whether the conduct was unlawful. *Colbruno v. Kessler*, 928 F.3d 1155, 1165 (10th Cir. 2019).

This Court should reverse the denial of qualified immunity and remand with instructions to dismiss this matter as to the Individual Defendants in their individual capacities.

**ARGUMENT**

**I.      Plaintiff's Allegations, Accepted as True, Do Not Establish a First Amendment Violation.**

The qualified immunity analysis permits this Court to address the constitutional merits independent of the clearly established inquiry. *Pearson v. Callahan*, 555 U.S. at 236. Here, the merits favor Defendants for a reason that tracks the clearly established analysis but goes further. The district court assumed that *Counterman* supplied the governing constitutional standard for university student discipline. That assumption was in error. Plaintiff's own allegations do not demonstrate the kind of First Amendment violation that would strip these officials of immunity.

**A.      *Counterman* does not apply in the factual situation presented.**

The district court determined that *Counterman* applies to Plaintiff's case. Specifically, the Court stated that the rule in *Counterman* applies to civil as well as criminal cases. [App. Vol. III at 648]. As such, the Court concluded Plaintiff has stated a constitutional claim against these Defendants. The Court was in error.

For the last fifty years, schools have been permitted to discipline students for speech that disrupts the campus. *See Tinker*, 393 U.S. 503, *Mahanoy*, 594 U.S. 180,

and *Slaughter*, 514 F.2d 622 (10th Cir. 1975). This doctrine has been extended to colleges and universities both by the Supreme Court and by this circuit. *See Healy v. James*, 408 U.S. 169, 180, 189, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); *Papish v. Board of Curators of University of Missouri*, 410 U.S. 667, 669-70, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973); *Hunt v. Board of Regents of University of New Mexico*, 792 Fed. App'x 595 (10th Cir. 2019) (discussing that *Healy* extended the doctrine to colleges and Universities); *Thompson v. Ragland*, 23 F.4th 1252, 1256 (10th Cir. 2022) (same). Thus, it has long been established that schools, due to their unique structure and needs, are permitted to discipline students for speech that causes disruption to the school.

Plaintiff asserts that *Counterman* disrupts the well-established principle that schools can discipline students for disruptive speech. According to Plaintiff, unless the school can prove that Plaintiff's threatening speech meets the criminal *mens rea* test set forth in *Counterman*, then a student's conduct is beyond the reach of the school. Plaintiff and the district court place too much weight on the *Counterman* holding.

In *Counterman*, the defendant was convicted under Colorado's true threat criminal statute. On appeal, he alleged that Colorado had not proven the adequate *mens rea* to support the conviction. The Supreme Court faced two questions. First, whether a conviction under a state's criminal true-threats statute requires proof of

*mens rea* and, if so, what level of *mens rea* is required? The Court's holding was narrow. "*Counterman* held only that in a criminal conviction for a true threat of violence, the First Amendment requires proof that the defendant had some subjective understanding of the threatening nature of his statements." *Ford v. McKesson*, 171 F.4th 332, 343 (5th Cir. 2026).

Plaintiff now attempts to extend *Counterman* beyond the scope of a criminal true threats statute and apply it to school disciplinary proceedings, which seek to discipline a student for engaging in speech that caused an actual disruption on campus. According to Plaintiff, since the school did not establish a "*mens rea*,"[2] it was foreclosed from disciplining her conduct.

The *Counterman* majority wrote in terms of criminal liability. The Court required subjective awareness because criminal punishment demands heightened culpability, given the risk that speakers will "swallow words that are in fact not true threats" if measured against an objective standard alone. *Counterman*, 600 U.S. at 77-78. That justification loses force in administrative proceedings where the consequence is a disciplinary sanction rather than incarceration. University discipline does not carry the stigma or liberty deprivation that animated the

---

[2] *Mens rea* is inherently a criminal concept. Latin for "the guilty mind", *mens rea* is defined as "the state of mind that the prosecution, to secure a conviction, must prove that the defendant had when committing a crime. *Mens rea*, Black's Law Dictionary, (12th ed. 2024).

*Counterman* majority's concern about chilling effects in the shadow of criminal prosecution. Furthermore, a school has independent grounds on which it may discipline disruptive speech including: threats aimed at students, faculty, or staff; material disruption of the learning environment; or an invasion of the rights of others. Even if these justifications do not lead to criminal action, the school has independent reasons to regulate the offending speech.

The district court cited the majority's statement that the First Amendment "precludes punishment, whether civil or criminal," for the proposition that *Counterman* governs civil proceedings. *Counterman*, 600 U.S. at 76. But that language appears in the majority's discussion of *Brandenburg's* incitement framework, not its true-threats holding. *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). The *Counterman* Court's actual holding, announced at pages 69 and 77-79, addressed the *mens rea* "required in a true threats case" involving criminal prosecution. *Id.* at 69. Reading the incitement discussion to extend the true-threats holding beyond its stated terms conflates two distinct First Amendment doctrines.

As detailed in Part II, no federal appellate court has held that *Counterman's* subjective recklessness standard constrains university disciplinary proceedings. Every court to address the question has either refused to extend *Counterman* beyond

16

criminal prosecution or applied an objective disruption framework that does not require proof of subjective intent. *See infra* Part II.B.

Because *Counterman* does not apply to university administrative proceedings, the constitutional analysis proceeds under the frameworks that courts have actually used when confronting university student speech. The Eleventh Circuit in *Damsky* applied *Tinker*'s substantial disruption standard in granting a stay based on the university's likelihood of success under an objective disruption theory. *Damsky*, 2026 WL 75122 (citing *Boim v. Fulton Cnty. Sch. Dist*., 494 F.3d 978, 984 (11th Cir. 2007)). The First Circuit adopted another variant, applying a modified *Tinker* calibrated to the university context, emphasizing that college students are young adults who are less impressionable than younger students and that a university is "peculiarly the marketplace of ideas." *Doe v. University of Massachusetts*, 145 F.4th 158 (1st Cir. 2025). The Eastern District of Washington, acknowledging that the Supreme Court and Ninth Circuit have not extended the student speech doctrine to the context of colleges and universities, applied three separate frameworks simultaneously rather than choose among them. *R.W. v. Columbia Basin College*, No. 18-CV-05089-MKD, 2025 WL 1693554 (E.D. Wash. June 16, 2025). Under any of those approaches, the subjective-intent question that dominates Plaintiff's primary argument becomes irrelevant, and the analysis turns to whether the university faced substantial disruption or any other reason that the courts have held justifies

regulating a student's speech, including curbing harassment aimed at particular individuals, threats aimed at teachers or students, or other acts which implicate students' rights and learning. *See Tinker* 393 U.S. at 513 (schools have an interest in regulating speech that materially disrupts classwork or involves substantial disorder or invasion of the rights of others); *Mahanoy Area School District,* 594 U.S. at 188 (schools can regulate speech that amounts to bullying or threats); *West v. Derby Unified School District*, 206 F.3d 1358, 1366-67 (10th Cir. 2000) (schools can regulate speech which demonstrates a reasonable basis for projecting that disruption will occur); *Taylor v. Roswell Independent School District*, 713 F.3d 25, 36-37 (2013) (disruption need not materialize so long as the speech might lead authorities to forecast "substantial disruption" or interference with rights of others). The record, including the district court's own finding that Plaintiff's speech caused "undisputed" disruption [App. Vol. III at 660], readily satisfies that standard.

First, Plaintiff's speech is undisputed and accurately recited by the district court and Plaintiff's own filings. Plaintiff stated she "wished that [Kate Stanton, an administrator at the University] would die" and that she wanted other administrative staff at the medical school to die. Plaintiff stated, "I am so tired and done; I want to rip my head off," and "leave a note to the news at the school and let them know that it's this place's fault and destroy the school in the process." Plaintiff stated, "I want to end it all at the school, five minutes before post it to the news, tell other med

18

schools, and take the administration with me." Plaintiff stated, "[I want to] yeet off the planet and yeet them [the administrators] too;" and she stated, "I want her to pay in one way or another, and I want the school to pay in one way or another." [App. Vol. I at 013-014, 031-032; App. Vol. III at 633]. These statements should be well understood to be threatening, whether or not they constitute a criminal "true threat" under the *Counterman* standard.

As found by the district court, it is <u>undisputed</u> that the school suffered significant disruption in response to Plaintiff's speech: "[I]t is undisputed that Plaintiff's speech caused tangible disruption. Nonessential staff were sent home, access to the Student Union Building was restricted, and an optional graduation event for seniors was cancelled." [App. Vol. I at 022; App. Vol. III at 660 (disruption "undisputed")]. There is no need to rely on a reasonable prognostication of disruption. The disruption occurred, and the district court found so.

*Counterman* was not intended to disrupt the well-established principles set forth in the *Tinker/Mahanoy*-related cases. If it had meant to displace such a well-established doctrine, the Supreme Court would have done so more clearly.[3] In fact,

---

[3] Lower courts should never conclude that the Supreme Court's more recent cases have, by implication, overruled earlier precedents. The courts should apply the Supreme Court case that *directly* controls, leaving future modification to the Supreme Court. *Agnosti v. Felton*, 521 U.S. 203, 207, 117 S. Ct. 1997, 138 L.Ed.2d 391 (1997). *Tinker* and other school speech cases clearly control this case, not the criminal case, *Counterman*.

*Counterman* does not displace the school speech doctrine. *Counterman* applies to criminal prosecution of true threats. Nothing more. *Tinker* and its progeny are still the law as it applies to campus speech, and based on the undisputed facts of this case, Plaintiff's actual quotes, and the disruption that followed, *Tinker* and its progeny are clearly satisfied. Plaintiff has not demonstrated a First Amendment violation, and the Defendants should be granted qualified immunity.

> **B. Even if *Counterman* applies, Plaintiff has failed to demonstrate a constitutional violation because Plaintiff's own pleadings demonstrate the subjective intent necessary to satisfy *Counterman's* requirements.**

> **1. The Student Code provision mirrors *Counterman's* own definition of true threats.**

Even accepting the district court's application of *Counterman*, the constitutional violation finding cannot stand because the officials enforced a standard that tracks the very constitutional rule the district court identified. The district court acknowledged this. In its own words, the Student Code provision, Disorderly Conduct and Unwanted Behaviors – Threatening behavior under Section II.4(e), mirrors the true-threats definition articulated in *Counterman* and *Virginia v. Black* nearly verbatim. [App. Vol. III at 649]. *Virginia v. Black*, 538 U.S. 343, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003).

That determination narrows the constitutional question considerably. If the standard that officials enforced is the same standard the First Amendment requires,

then the only path to a constitutional violation runs through the factual question of whether Plaintiff lacked the subjective recklessness *Counterman* demands. The adequacy of the rule is not in dispute; the district court resolved that question when it dismissed Plaintiff's vagueness claim with prejudice. All that remains is whether the Amended Complaint's allegations, accepted as true, establish that Plaintiff consciously disregarded the risk that her statements would be viewed as threatening. They were.

Because the Student Code draws the same line *Counterman* draws, officials who enforced it were not operating under a standard that demanded less than the Constitution requires or that targeted speech the First Amendment protects. They were applying the constitutional standard itself. On interlocutory appeal, the question is not whether officials assessed the facts correctly on a particular occasion, but whether the allegations establish a First Amendment violation as a matter of law. For the reasons set forth below, Plaintiff's own allegations foreclose that conclusion.

> **2.** **Plaintiff's own statements, accepted as true, demonstrate that she consciously disregarded the risk that her words would be perceived as threatening.**

Even under *Counterman's* recklessness standard, the facts alleged in the Amended Complaint and credited in the district court's analysis do not exonerate Plaintiff of the subjective awareness the *Counterman* standard requires. Recklessness in this context means that the speaker "consciously disregard[ed] a

substantial risk that [her] communications would be viewed as threatening." *Counterman*, 600 U.S. at 69. Whether undisputed allegations satisfy that legal standard is a question this Court may resolve on interlocutory review. *See Mitchell v. Forsyth*, 472 U.S. at 528.

During the May 1 follow-up call, Plaintiff said she wanted to "end it all at the school" and described taking the administrators with her. [App. Vol. I at 138-139.] When asked whether she experienced "harmful thoughts," she responded, "[s]ure as hell did the day that I called. No. Like clearly like nothing to do it with. But..." *Id*. The qualification that follows her admission does not defeat recklessness. Plaintiff admitted conscious awareness of harmful thoughts directed at specific people; her assertion that she lacked the means to act goes to capability, not to whether she disregarded the threatening character of her words. These are not ambiguous statements that a reasonable listener might misinterpret. They are words that, on their face, convey a risk of violence directed at specific people and a specific place. Taken together with Plaintiff's training in the Tarasoff duty-to-warn framework and her own admission that she experienced harmful thoughts, the record establishes that Plaintiff was aware of the threatening character of her statements and consciously disregarded the risk. As a matter of law, a speaker who makes these statements and later claims she meant something different has not negated the conscious-disregard

element. The undisputed content of the statements themselves satisfies *Counterman's* threshold.

Plaintiff contended at the district court that the May 1 call was initiated by Schofield through a counselor, and that she would not have made those statements "if not prompted." [App. Vol I at 017-018]. Even so, this does not change the recklessness analysis. The question under *Counterman* is not whether the speaker was prompted, but whether she was aware that her words carried a threatening character. A speaker who uses the language Plaintiff used on those calls is aware of the impact, regardless of who initiated the conversation. The prompting theory might bear on mitigation or on the weight a factfinder gives the statements at trial, but it cannot, as a matter of constitutional law, negate the subjective awareness that *Counterman* requires.

Plaintiff also points to the hearing panel's finding that there was "no compelling evidence" she used or implied the word "kill." [App. Vol I at 020]. But *Counterman* only asks whether the speaker consciously disregarded a substantial risk that her communications, taken in context, would be viewed as threatening violence. Plaintiff's statements, taken in their full context, satisfy that standard without requiring the explicit word "kill".

### 3. Plaintiff's expectation of 988 confidentiality is irrelevant to the recklessness inquiry.

Plaintiff's central narrative turns on the idea that she spoke in confidence to a crisis line, that her statements were never meant to reach the University, and that the chain of disclosure itself violated her expectations of privacy. That narrative does not establish a First Amendment violation as a matter of law.

Plaintiff's own testimony forecloses any claim that she held a categorical expectation of confidentiality. At the hearing, she acknowledged her familiarity with the *Tarasoff* duty-to-warn framework, describing her direct experience applying it in her psychiatric rotation. [App. Vol. II at 353]. That acknowledgment undermines the claim that she spoke to 988 under a reasonable belief that nothing she said could ever be disclosed. But even setting that admission aside, the confidentiality question is immaterial to the recklessness inquiry. This argument does not hold that any speaker with knowledge of duty-to-warn obligations has necessarily acted recklessly. Unlike the case at bar, a medical student who calls 988 merely to discuss feelings of sadness or academic stress has not "consciously disregarded" anything, because those statements carry no objectively threatening character. What matters under *Counterman* is the awareness that the specific statements at issue would be viewed as threatening violence. Plaintiff's *Tarasoff* training is relevant here because it forecloses the claim that she was wholly unaware her statements could trigger a

mandatory report when those statements included language about taking the administrators with her.

*Counterman*'s recklessness standard focuses on the speaker's mental state regarding the threatening nature of her speech, not on the speaker's expectations about who will hear it. The relevant question is whether Plaintiff consciously disregarded the risk that her statements would be "viewed as threatening." *Counterman*, 600 U.S. at 69. Courts drew this distinction well before *Counterman*. In *Ponce v. Socorro Independent School District*, 508 F.3d 765, 771-72 (5th Cir. 2007), the Fifth Circuit assessed student threatening speech based on its objective capacity to convey a risk of school violence. The Eighth Circuit confirmed in *D.J.M. ex rel. D.M. v. Hannibal Public School District No. 60*, 647 F.3d 754, 764 (8th Cir. 2011), that listener reactions to threatening student speech confirm its character, and not a prerequisite to official action. *Counterman* adopted a recklessness formulation consistent with this principle. The word "viewed" implies perception by some audience, but the standard does not hinge on the speaker's control over the audience's identity. A person who makes the statements Plaintiff made to a crisis counselor has produced a communication that carries a threatening quality, whether or not she expected the counselor to share it.

The contrary rule would produce untenable results. If a speaker's subjective belief that her words would remain private could defeat recklessness, then any

student could immunize threatening statements by directing them to someone the student expected to maintain confidentiality. That rule would mean that a person who threatens violence would be immune from consequences merely because they believe that the listener would keep the speaker's confidence. *Counterman* does not create such a safe harbor. The recklessness inquiry looks to the speaker's awareness of the threatening nature of the communication itself, not to the speaker's expectations about its dissemination.

The question in this appeal is not about the importance of the 988 crisis line or of the general expectation of confidentiality.[4] Instead, the question at issue is a narrow one: whether the facts alleged, taken as true, establish as a matter of law that Defendants violated the First Amendment by disciplining Plaintiff based on her statements. They do not.

> **C.** **The district court failed to consider the acts of each Defendant to identify what constitutional violation, if any, they may have committed.**

In its Motion to Dismiss at the district court, the Defendants asserted absolute quasi-judicial immunity. [App. Vol. III at 422-24; 641-43]. The Defendants pointed out that they all acted within their roles as members of an adjudicatory process and, as such, they have immunity under *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894,

---

[4] An expectation which must be tempered through state law. *See* 43A O.S. §1-109(E); 59 O.S. §1376(b).

57 L.Ed.2d 895 (1978) and *Horwitz v. State Bd. of Medical Examiners of State of Colo.*, 822 F.2d 1508 (10th Cir. 1987). The district court overruled this defense, asserting that the Defendants were not acting as formal adjudicators under a process such as the Administrative Procedures Act or a licensing statute. Thus, this case is more like *Cleavinger v. Saxner*, 474 U.S. 193, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985), which held that the defendants, who hear an administrative disciplinary case in a prison, were not similarly situated to adjudicators because the hearing panel was made up of institutional employees who lacked the kind of independence of judicial bodies. [App. Vol. III at 643].

In *Cleavinger*, the Supreme Court indeed determined that the "adjudicatory" body at issue was not made up of independent decision-makers, and therefore the defendants lacked absolute immunity. The Court went on to say, however, that qualified immunity should provide sufficient protection for the hearing committee members. *Cleavinger*, 474 U.S. at 206. Similarly, in *Wood v. Strickland*, 420 U.S. 308, 320-21, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), the Supreme Court denied absolute immunity to school board members but stated that qualified immunity should be sufficient to protect the school board members from liability lawsuits. Thus, once the district court denied absolute immunity, it should have considered the same argument in light of the qualified immunity context. Having denied absolute immunity, the court should have considered the role of each Defendant and the

27

actions each took to determine whether a constitutional violation had been pleaded. *Matthews v. Bergdorf*, 889 F.3d 1136, 1144-45 (10th Cir. 2018) (holding district court erred by failing to isolate the allegedly unconstitutional acts of each defendant).

The district court, in this case, never isolated the facts upon which the allegations of constitutional violations rest against each Defendant. "Good as to one, good as to all" is *never* the proper analysis of qualified immunity. *Id.*; *Pahls v. Thomas*, 718 F.3d 1210, 1227-28 (10th Cir. 2013).

Kalyn Cavazos is the Director of Student Conduct. She made a determination that Plaintiff made a threat against the University and its administrators. Cavazos' recommendation was expulsion for the Plaintiff. The Plaintiff disagreed and demanded a hearing regarding the charges and the sanction. At the hearing, Cavazos acted as prosecutor and presented Plaintiff's statements to a neutral hearing panel which determined that the statements were a violation of university policy but did not warrant expulsion. [App. Vol. II at 396]. Cavazos then appealed the panel decision to Surratt. [App. Vol. II at 398]. Any action undertaken by Cavazos was in her capacity as Student Conduct director and was in the nature of presenting a claim against Plaintiff based on the statements made by Plaintiff. It is not a violation of the First Amendment to charge someone with a policy offense and then present a hearing regarding that charge. Ultimately, it was not Cavazos who sanctioned the Plaintiff.

The sanction was based on the hearing panel's findings and conclusions. Plaintiff has, therefore, failed to demonstrate a First Amendment violation by Cavazos.

David Surratt is the Vice President of Student Affairs and Dean of Students. His only role is alleged to be that he heard the appeal of the hearing panel's decision. Surratt affirmed the panel decision that Plaintiff had made a threat in violation of university policy. [App. Vol. II at 400]. In his review, Surratt watched the entire hearing, reviewed the exhibits, and considered arguments raised by the parties in their appeal. [App. Vol. II at 400-01]. In the transcript of the hearing, neither Plaintiff nor her counsel raised the issue of "true threats" or "free speech" or made any mention of *Counterman*. [App. Vol. II at 224-29, 360-67]. The issues considered by Surratt on appeal do not include any argument about free speech, or *Counterman*. [App. Vol. II at 400-02]. Thus, Surratt only ruled upon the items raised in the hearing and on appeal. Surratt did not violate Plaintiff's First Amendment rights (or, for that matter, even commit error) by affirming a panel decision on a record where no party raised true threats, free speech, or *Counterman*.

Terry Schofield is the Deputy Chief of the OUHSC Police. Plaintiff admits that all actions taken by Deputy Schofield in relation to this matter were taken in the course and scope of his employment with the University. [App. Vol. I at 010]. Plaintiff's complaints about Deputy Schofield are that after he received the report from 988 about Plaintiff's threats against the University and its administration, he

undertook an investigation. Plaintiff complains about Deputy Schofield's communications with the 988 service. Plaintiff alleges that Deputy Schofield continued his investigation even though he had indicated to another person that he did not believe a crime had been committed. Although Plaintiff's framing of the facts at issue may give the actions taken by Deputy Schofield an appearance of impropriety, none of the facts give rise to the constitutional claims Plaintiff asserts. Schofield's actions were investigatory, not disciplinary. He asked 988 to follow up with Plaintiff and discussed protective custody, but he did not initiate or participate in the Student Conduct proceedings, had no contact with Plaintiff herself, and made no decision regarding her enrollment status. The protective custody request was denied by 988. Investigating potential threats to campus safety is a core law enforcement function, and no First Amendment law prohibited Schofield from carrying out that investigation. Plaintiff's claims against him fail.

In reviewing the isolated allegations made against each Defendant, Plaintiff has pointed to no First Amendment violation. As such, she has not satisfied the first prong of the qualified immunity analysis, and the district court should be reversed.

## II. Qualified Immunity Should be Granted Because the Law is not Clearly Established

This Court need not decide whether *Counterman* extends to civil university proceedings. It is sufficient to recognize that the district court built its constitutional violation finding on a doctrinal foundation that no appellate court has endorsed and

that several have declined to adopt. The Defendants are entitled to qualified immunity because no clearly established law prohibited their conduct in May 2024. The district court held otherwise by treating *Counterman* as though it had settled a question that remains open in every federal circuit today. *Counterman* addressed the *mens rea* required for criminal prosecution of true threats. Whether that standard applies to a public university's decision to discipline a student through its own conduct process is a question no circuit court has answered. This was not a situation where existing precedent placed "beyond debate" what the law required. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011).

## A.     The Clearly Established Standard

When a defendant asserts qualified immunity, the plaintiff has a heavy burden to overcome. The plaintiff must demonstrate a constitutional violation whose contours were clearly established at the time of the alleged violation. *Pearson*, 555 U.S. at 240; *Mullenix v. Luna*, 577 U.S. 7, 11, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Medina v. Cram*, 252 F.3d 1124, 1127 (10th Cir. 2001) (quotes omitted). Unless the state official violates a constitutional right in a way that the official knows or should know is a violation, qualified immunity attaches, and the official cannot be held individually liable. *Id.*

31

The Supreme Court tells us that not only must a right be established, but it must be clear to state officials that their actions violate that right. "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what [they are] doing violates that right." *Mullenix*, 577 U.S. at 12. While a case on point is not strictly necessary, existing precedent must have placed the statutory or constitutional question [regarding the illegality of the defendant's conduct] beyond debate." *Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir. 2019); *see Estate of B.I.C. v. Gillen*, 761 F.3d 1099, 1106 (10th Cir. 2014) (the plaintiff must demonstrate a substantial correlation between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited). *Accord Mullenix*, 577 U.S. at 13 (qualified immunity attaches where no precedent squarely governs the facts); *Id.* at 12 (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law" (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986))). Even seminal Supreme Court cases on particular points of law do not "by themselves create clearly established law outside 'an obvious case.'" *Sanchez*, 105 F.4th at 1293. The assertion of qualified immunity creates a presumption that the defendant is immune from suit. *Id.* at 1292. Plaintiff's positions fail in the proper application of the qualified immunity standard.

**B.** *Counterman* **did not clearly establish that its subjective recklessness standard governs university student discipline.**

*Counterman* answered a narrow question. The Court held that true-threats criminal prosecutions require proof that the speaker acted with subjective recklessness, meaning the speaker "consciously disregarded a substantial risk that [the] communications would be viewed as threatening violence." 600 U.S. at 69, 77-79. The majority's analysis was grounded in the specific concerns of criminal law, the severity of criminal penalties, and the chilling effect that strict liability or negligence standards would impose in the shadow of potential imprisonment. The opinion did not address civil liability, administrative proceedings, or school discipline. In fact, in the three years since *Counterman*, no federal appellate court has held that its subjective recklessness standard extends beyond criminal prosecution. The courts that have confronted the question in university settings have gone out of their way to avoid it.

The Eleventh Circuit confronted the question in *Damsky*, a case involving a law student disciplined for antisemitic social media posts. When the university moved to stay a preliminary injunction pending appeal, the court granted the stay under *Tinker*, finding the university was likely to succeed on a substantial disruption theory without reaching whether *Counterman* required proof of subjective recklessness. The underlying merits appeal remains pending, but even at this preliminary stage, the court found *Tinker*, not *Counterman*, to be the more

33

appropriate framework. The *Damsky* district court had reached the same result through a different route, holding that the posts were not objectively true threats without addressing whether *Counterman's* subjective recklessness standard applies to university discipline at all. *Damsky v. Summerlin*, 810 F.Supp.3d 1258, 1269 (N.D. Fla. 2025).

The Second Circuit took a similar path. In *Leroy v. Livingston Manor Central School District*, 158 F.4th 414, 422-23, 427-28, n.4 (2d Cir. 2025), a concurring judge proposed that *Counterman's* recklessness standard should be imported into the school discipline context. The majority did not adopt that proposal. Although the court acknowledged that "adopting a bright line test here would aid schools," it concluded that it could not "set out an exhaustive list or a broad rule" for off-campus student speech. *Id.* at 427-28. The strongest judicial endorsement of extending *Counterman* to schools was a concurrence that the sitting panel's majority did not adopt.

The Fifth Circuit recently confirmed the pattern. In *Ford v. McKesson*, 171 F.4th 332 (5th Cir. 2026), the court reversed a district court that had imported *Counterman* into a civil negligence action against protesters, holding that *Counterman's* "holding about the elements of an unrelated criminal offense changes nothing" in the civil context. *Id.* at 343. *Ford* involved tort liability rather than government discipline, but its reasoning reinforces what every other court

considering the question has concluded: *Counterman's* recklessness standard has not migrated beyond the criminal prosecution context in which it was announced.

Other courts have reached the same conclusion through different routes. The Eastern District of Washington upheld a community college's disciplinary action against a nursing student under a standard that did not require proof of subjective intent, holding that officials could act on "an identifiable and credible threat of school violence"…"regardless of the speaker's intent." *R.W.*, 2025 WL 1693554, at *35. The Eastern District of Virginia, in a civil conspiracy action, held *Counterman* "inapplicable in this civil lawsuit with no criminal statute at issue." *Sealed Plaintiff 1 v. Front*, No. 22-CV-00670, 2024 WL 1395477, at *29 (E.D. Va. Mar. 31, 2024). And when the Fifth Circuit reversed the NLRB on other grounds in a case where the employer had argued that *Counterman* requires a showing of subjective coercive intent, the court found it unnecessary to reach that constitutional question at all. *Apple Inc. v. NLRB*, 143 F.4th 291, 301, n.37 (5th Cir. 2025).

Indeed, Justice Sotomayor has acknowledged as much. In a statement respecting the denial of certiorari in *McKesson v. Doe*, 144 S.Ct. 913, 218 L.Ed.2d 442 (2024) (mem.), she observed that *Counterman* "made clear that the First Amendment bars the use of 'an objective standard' like negligence for punishing speech" and cautioned lower courts to give "full and fair consideration to arguments

35

regarding *Counterman's* impact."[5] *Id.* 144 S.Ct. at 914. That a sitting Justice views the post-*Counterman* landscape as unsettled confirms that no clearly established consensus existed in May 2024.

Every court to consider the question has either refused to apply *Counterman's* recklessness standard to non-criminal student discipline or deliberately avoided deciding the issue. Many of these decisions postdate the conduct at issue, but that is precisely the point. If courts still have not resolved the question more than two years later, university administrators in May 2024 could not have known the answer was beyond debate.

The Fourth Circuit recently confirmed this conclusion in a related context. Analyzing whether *Counterman* announced a new rule for purposes of collateral review, the court held that *Counterman*'s subjective-intent requirement "wasn't dictated by precedent" because "[c]ourts [were] divided" on the question before the Supreme Court decided it. *In re Rendelman*, 129 F.4th 248, 254 (4th Cir. 2025). The court characterized the rule *Counterman* adopted as "open to reasonable debate." *Id.* That holding addressed criminal true-threat prosecutions alone; it said nothing about civil or administrative discipline.

---

[5] It should be noted that upon remand, the Circuit court followed Justice Sotomayor's urging and considered *Counterman,* but it still concluded that *Counterman* does not apply. *Ford v. McKesson*, 171 F.4th at 343

If the criminal standard itself were a new rule, the extension of that standard to university administrators was even less clearly established. Plaintiff may point to Justice Barrett's dissent in *Counterman*, which observed that the majority's holding "affects the civil consequences for true threats just as much as it restricts criminal liability." 600 U.S. at 118–19 (Barrett, J., dissenting). But a dissent joined by one other Justice cannot clearly establish the law. The Barrett dissent proves the question was contested rather than resolved. Barrett's dissent warned that the majority's recklessness standard would make it harder for school administrators to discipline students for threatening speech. *Id.* at 119-20. Also, a dissenter's prediction about a holding's downstream consequences does not establish that the holding actually reaches those consequences. The majority did not address school discipline, and its silence confirms it did not intend the true-threats holding to extend that far. If two Justices believed the majority holding reached civil cases while seven declined to say so, the scope of the holding remained an open question. The Fifth Circuit confirmed as much when it rejected the civil extension in *Ford*, notwithstanding both the Barrett dissent and Justice Sotomayor's subsequent statement urging lower courts to consider *Counterman's* civil implications. *See Ford*, 171 F.4th at 343. A reasonable university administrator reviewing this landscape in May 2024 would have found nothing, in any jurisdiction, telling her she was constitutionally required

to apply a subjective recklessness standard before acting on statements that multiple trained professionals had independently flagged as concerning.

### C. The competing doctrinal frameworks for a university's student conduct discipline confirm that no clearly established rule existed.

The uncertainty about *Counterman's* reach is compounded by a more fundamental problem. Federal courts do not agree on the threshold question of which analytical framework governs when a public university student makes statements that could be characterized as threatening. At least three distinct bodies of law compete for application, and different circuits have chosen different ones.

No two circuits have settled on the same answer, and the frameworks they have chosen are incompatible on the question that matters most here. As discussed in Part I(A), *supra.*, there is a significant disparity among courts regarding how schools address threatening speech. The Eleventh Circuit in *Damsky* applied *Tinker*'s substantial disruption standard in granting a stay based on the university's likelihood of success under an objective disruption theory. The First Circuit modified *Tinker* to the university context, emphasizing that college students are "young adults" who are "less impressionable than younger students" and that a university is "peculiarly the 'marketplace of ideas.'" *Doe v. University of Massachusetts*, 145 F.4th 158 (1st Cir. 2025). And the Eastern District of Washington, surveyed the competing doctrines and applied three separate frameworks simultaneously. *R.W.*, 2025 WL 1693554.

The disagreement is not just doctrinal. Under the Eleventh Circuit's approach, "[w]hether the speaker intended to cause a material disruption is irrelevant." *Damsky*, 2026 WL 75122, at *2. These are not variations on a theme. They are incompatible answers to the same question.

The Tenth Circuit has not resolved which framework governs. The closest this Court has come is *Thompson v. Ragland*, which applied *Tinker* principles to a university student's off-campus speech, but that case involved a student encouraging honest course evaluations, not threatening speech. This Court has acknowledged "unmistakable gaps in the case law" regarding off-campus student speech, *C1.G v. Siegfried*, 38 F.4th 1270, 1280 (10th Cir. 2022), and a district court within this circuit granted qualified immunity to university officials on precisely the ground that "the Tenth Circuit has not addressed off-campus, online student speech at the public school or university level" and that the legal landscape was "constantly developing." *Yeasin v. Durham*, 224 F. Supp. 3d 1194, 1202-03 (D. Kan. 2016).

The Second Circuit reached the same conclusion in *Radwan v. Manuel*, 55 F.4th 101 (2d Cir. 2022), where university officials terminated a student-athlete's scholarship after she displayed a vulgar gesture on national television during a game. Even though the district court found triable issues on the merits of the First Amendment claim, the Second Circuit granted qualified immunity because the officials had no clearly established law to follow. The court surveyed the same

39

doctrinal landscape at issue here, walking through *Tinker*, *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), *Papish*, and *Mahanoy*, and concluded that "[n]either the Supreme Court nor any circuit court has yet provided an alternative legal standard or framework" for university administrators. *Radwan*, 55 F.4th at 122. The court approvingly cited this Circuit's decision in *Hunt v. Board of Regents of University of New Mexico*, 792 F. App'x 595, 606 (10th Cir. 2019), for the same proposition. *Id.*

When the threshold question--which framework even applies--remains genuinely contested across circuits, the subsidiary question of what that framework requires cannot be beyond debate. A university administrator confronting statements like Plaintiff's in May 2024 would have had to pick a framework without knowing which one the courts would ultimately endorse and then apply that framework's standard without knowing whether that standard required proof of subjective recklessness, objective reasonableness, material disruption, or something else. This is the situation qualified immunity was designed to protect.

Courts have long recognized that officials charged with campus safety "must be permitted to react quickly and decisively to address a threat of physical violence against their students, without worrying that they will have to face years of litigation second-guessing their judgment as to whether the threat posed a real risk of

40

substantial disturbance*." Ponce v. Socorro Independent School District*, 508 F.3d 765, 772 (5th Cir. 2007). That principle applies with particular force where, as here, the officials acted on reports from a crisis-line supervisor, a deputy police chief, and a behavioral intervention team, all through a structured hearing process, and the governing legal framework itself remained contested. Qualified immunity protects exactly this kind of good-faith institutional response from being unwound years later under a doctrinal standard that did not exist when the officials acted.

### D. The district court's own treatment of the claim underscores the doctrinal uncertainty.

The district court's March 13, 2026, orders also illustrate this issue. In the order denying qualified immunity [App. Vol. III at 632], the court analyzed Plaintiff's First Amendment claim through *Counterman's* true-threats framework, concluding that the law was clearly established, although, according to the district judge, it was a "close case." [App. Vol. III at 645]. As the judge explained in his Order denying the Plaintiff's Motion to Preliminary Injunction, when it decided the Motion to Dismiss, "the Court recognized that Plaintiff's First Amendment claim presented a "close case". [App. Vol. III at 659]. This statement by the district court, in and of itself, should defeat any assertion that *Counterman* applies to the case at bar with obvious clarity. After all, a "close case" is never beyond debate.

Also, importantly, in that same order, the court applied *Counterman* only briefly before pivoting to an alternative analysis under *Tinker, Mahanoy,* and

*Slaughter*, finding that "it is undisputed that Plaintiff's speech caused tangible disruption." [App. Vol. III at 660].

The court's resort to an alternative framework, one it did not employ or even cite in the qualified immunity analysis, reinforces what the case law already demonstrates. The governing framework for this type of claim is genuinely uncertain. If the judge who studied this record most closely applied two different doctrinal tools to address the same set of facts, reasonable officials acting in real time cannot be held to have known the answer in advance.

The different standards of review in the two orders do not diminish this point. When the court turned from the legal question of clearly established law to the merits question of likelihood of success, it abandoned *Counterman* as its sole analytical tool and reached for an entirely different doctrinal framework, one it had not mentioned in its legal analysis immediately prior. The significance lies in that framework divergence. A court confident that *Counterman* provided the governing standard had no reason to pivot to *Tinker* and *Mahanoy* when it turned to the merits. As the Eleventh Circuit has observed, "preexisting law must dictate, that is, truly compel, (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent" that the conduct was unlawful. *Denno v. Sch. Bd. of Volusia Cnty.*, 218 F.3d 1267, 1270 (11th Cir. 2000). If the district court applied two different doctrinal tools to the same claim on the same day, the law did

not "truly compel" university administrators to know which framework governed their conduct.

### E. The "obvious clarity" exception cannot rescue the district court's analysis.

Plaintiff argued below, and the district court agreed, that *Counterman* applies with "obvious clarity" to the Defendants' conduct under *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002), eliminating the need for factually analogous precedent. That argument does not survive scrutiny.

The obvious clarity exception occupies a narrow space in Tenth Circuit law. This Court treats the clearly established inquiry as binary. A prior decision must involve materially similar conduct, or must pronounce a general principle that applies with obvious clarity to the conduct at issue. *Sanchez*, 105 F.4th at 1292-93; *Shepherd v. Robbins*, 55 F.4th 810 (10th Cir. 2022). And, this Court has been explicit that the exception cannot apply when there are any relevant ambiguities about whether the conduct was unlawful. *Colbruno*, 928 F.3d at 1165. The Supreme Court has reinforced this demand for specificity with increasing regularity. In *Zorn v. Linton*, 146 S.Ct. 926 (2026) (per curiam), the Court reversed the Second Circuit for relying on generalized statements about excessive force rather than precedent addressing the specific conduct at issue. Even where a plaintiff invokes obvious clarity, the governing principle must be dictated by controlling authority or a robust consensus of cases of persuasive authority. *District of Columbia v. Wesby*, 583 U.S.

48, 63, 138 S.Ct. 577, 199 L.Ed.2d 453 (2018). The district court attempted to confine *Sanchez* to split-second excessive-force decisions. [App. Vol. III at 648]. But *Sanchez's* holding that "even seminal Supreme Court cases" do not by themselves clearly establish the law is not limited to any factual context. The Supreme Court confirmed as much in *Zorn*, reversing on the same principle outside the split-second setting.

This case is defined by relevant ambiguities, and they are not peripheral. Before an administrator could determine whether their conduct violated the First Amendment, they would need to resolve three nested legal questions that no court had clearly answered. They would first need to determine which doctrinal framework governs university student threatening speech (whether the true-threats doctrine, *Tinker* disruption analysis, or some other standard). They would then need to determine what that framework requires of the government actor (whether subjective recklessness, objective reasonableness, or proof of material disruption). And they would finally need to assess whether the speaker's mental state satisfies whichever standard applies. Each question is independently unresolved.

The ambiguity surrounding the *mens rea* question, in particular, predates *Counterman* by nearly a decade. In *Elonis v. United States*, 575 U.S. 723, 740, 135 S.Ct. 2001, 192 L.Ed.2d 1 (2015), the Supreme Court resolved a true-threats prosecution on statutory grounds alone, finding it "not necessary to consider any

First Amendment issues." *Counterman* answered the constitutional question eight years later, but only for criminal cases. Together, these unresolved questions place this case at the furthest possible distance from the "obvious clarity" the exception demands.

The obvious clarity cases where this Court has found the exception satisfied look nothing like the instant case. In *Irizarry v. Yehia*, 38 F.4th 1282 (10th Cir. 2022), this Court found obvious clarity for the right to film police performing their duties in public. But that finding rested on a consensus of six circuits recognizing the right. Here, not a single circuit has applied *Counterman* to university discipline. In *Rosales v. Bradshaw*, 72 F.4th 1145 (10th Cir. 2023), and *Luethje v. Kyle*, 131 F.4th 1179 (10th Cir. 2025), obvious clarity attached to uses of force where every factor in the analysis pointed against the officer and no plausible legitimate justification existed. Here, the Defendants acted on the same chain of professional assessments described above, each of which independently flagged the statements as concerning. Officials acting on that basis had, at minimum, a plausible justification for their response, and that is enough to defeat obvious clarity. *See Colbruno*, 928 F.3d at 1165 (existence of plausible legitimate purpose creates "relevant ambiguity" foreclosing obvious clarity); *Lowe v. Raemisch*, 864 F.3d 1205, 1212 (10th Cir. 2017) (rejecting exception where competent officials could reasonably disagree about the constitutionality of the conduct).

The obvious clarity doctrine is not an appropriate tool for importing a criminal *mens rea* standard into a novel civil context and then holding officials liable for failing to foresee that importation. The doctrine reaches only conduct whose unconstitutionality is self-evident. Disciplining a student after receiving multiple reports of threatening statements from trained professionals does not meet that standard.

Plaintiff's reliance in the district court on Schofield's contemporaneous statement that the speech at issue was "not a threat…it's not hate speech, it's free speech" [App. Vol. I at 116-17], cannot defeat qualified immunity. The Tenth Circuit has held that an official's subjective awareness of constitutional limits is "irrelevant" to the clearly-established-law inquiry. *Frasier v. Evans*, 992 F.3d 1003, 1014-15 (10th Cir. 2021). The inquiry is objective, fixed to what a reasonable official in the defendant's position would have known from binding precedent. *Id.*; *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818-19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). That rule applies with equal force to university administrators. *Pompeo v. Board of Regents of the University of New Mexico*, 852 F.3d 973, 982 (10th Cir. 2017). Schofield's contemporaneous characterization of the speech proves nothing about what the law clearly commanded in May 2024. Even a defendant who privately doubts the legality of her conduct retains qualified immunity unless the governing precedent placed the question "beyond debate." *Ashcroft*, 563 U.S. at 741.

46

Turning to these specific Defendants, none of their actions violated "clearly established law". Their specific involvement was outlined in Part I(C), *supra*. Kalyn Cavazos acted as the student conduct director and prosecutor at the disciplinary hearing. No law is clearly established that she could not prosecute a matter which she believed was sanctionable by the University. As stated, whether *Counterman* applies in the situation Cavazos faced remains an open question, but even if it did apply, no case law prohibits a student conduct officer from prosecuting a matter she believes involves sanctionable conduct, even where the underlying speech might also constitute a true threat.

David Surratt acted as an appellate reviewer of the panel decision. His role was limited to reviewing the record and considering arguments raised by the parties. Whether *Counterman* controls remained an unaddressed question. Surratt had no occasion to consider it because neither party raised true threats, free speech, or *Counterman* at the hearing or on appeal.

Deputy Schofield conducted an investigation into the threats made by Plaintiff. No case holds that law enforcement cannot investigate matters that might involve threats. Even *Counterman* would not prevent law enforcement's investigation. Further, this Circuit has granted qualified immunity where an officer's investigation was alleged to be retaliatory, finding no clearly established law foreclosing such conduct. *Lincoln v. Maketa*, 880 F.3d 533 (10th Cir. 2018)

47

(employment retaliation context; pretextual criminal investigation did not clearly constitute adverse action); s*ee also White v. Stone*, No. 21-CV-1207-SCY-JFR, 2023 WL 7165190, *16 (D.N.M. 2023) (no clearly established law barring brief surveillance of subject while arrest authorization pending) (citing *Hartman v. Moore*, 547 U.S. 250, 262, n.9, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006)).

## CONCLUSION

For the foregoing reasons, this Court should reverse the denial of qualified immunity and remand with instructions to dismiss this matter as to the Individual Defendants in their individual capacities.

Respectfully submitted,

/s/ M. Daniel Weitman
M. Daniel Weitman, OBA # 17412
C.B. Moore, OBA # 31653
Office of Legal Counsel
UNIVERSITY OF OKLAHOMA
660 Parrington Oval, Suite 213
Norman, Oklahoma 73019
Telephone: (405) 325-4124
Facsimile: (405) 325-7681
dan.weitman@ou.edu
cbmoore@ou.edu
*Attorneys for Defendants*

# CERTIFICATE OF SERVICE

I hereby certify that, on the 4th day of May 2026, I electronically filed the foregoing using the court's CM/ECF system, which will send notification of such filing to the following:

Rand C. Eddy – rand@eddylawok.com
Sawmon Y. Davani – sawmon@davanilawpllc.com

/s/ M. Daniel Weitman
M. Daniel Weitman

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT</u>

This document complies with the type-volume limitation of Fed. R. App. R. 32(g) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 10,916 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in a 14-point Times New Roman style.

Dated: May 4, 2026

<u>/s/ M. Daniel Weitman</u>
M. Daniel Weitman

# CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing: (1) all required privacy redactions have been made per 10th Cir. R. 25.5; (2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents; (3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, CrowdStrike Version 7.34.20610.0, Date April 15, 2026, and according to the program are free of viruses.

Dated: May 4, 2026

/s/ M. Daniel Weitman
M. Daniel Weitman

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| MEGAN HSIEH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-25-1160-J |
| | ) | |
| STATE OF OKLAHOMA ex rel., | ) | |
| THE BOARD OF REGENTS for the | ) | |
| UNIVERSITY OF OKLAHOMA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Plaintiff brings suit against the State of Oklahoma, ex rel. The Board of Regents for the University of Oklahoma (the University); David A. Surratt and Kalyn Cavazos in their official capacities (the University Defendants); and David A. Surratt, Kalyn Cavazos, and Terry Schofield in their individual capacities (the Individual Defendants) (collectively, the Defendants). Before the Court is the Defendants' Motion to Dismiss, which seeks dismissal of Plaintiff's Amended Complaint (Amend. Compl.) for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) and for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6) [Doc. No. 36] (Mot. to Dismiss). Plaintiff filed a response [Doc. No. 41] (Resp.), and Defendants replied [Doc. No. 42] (Reply). For the reasons set forth below, Defendants' Motion to Dismiss is GRANTED IN PART and DENIED IN PART.

### I. Background

Plaintiff was enrolled as a medical student at the University of Oklahoma Health Science Center and was registered with the University's disability accommodations office due to diagnoses of generalized anxiety disorder, major depressive disorder, and Attention Deficit Hyperactivity Disorder (ADHD). Amend. Compl. ¶ 1. In 2024, Plaintiff experienced a mental health crisis,

52

prompting her to contact the 988 Suicide and Crisis Lifeline, which provides "free and confidential emotional support to people in suicidal crisis or emotional distress." *Id.* ¶¶ 1, 5–6.  In her phone calls with the 988 operators on April 27 and May 1, Plaintiff made numerous statements that are the central focus of this litigation.[1]  For example, she stated: (a) she "wished that [Kate Stanton, an administrator at the University] would die" and that she wanted other administrative staff at the medical school to die; (b) "I am so tired and done; I want to rip my head off" and "leave a note to the news at the school and let them know that it's this place's fault and destroy the school in the process;" (c) "I want to end it all at the school, five minutes before post it to the news, tell other med schools, and take the administration with me;" (d) "[I want to] yeet off the planet and yeet them [the administrators] too;" and (e) "I want her to pay in one way or another, and I want the school to pay in one way or another."  *Id.* ¶¶ 8, 32, 33; Ex. 9.

During the April 27 phone call, the 988 operator was "able to stabilize" Plaintiff and create a "safety plan for her," so that by the end of the call she was "not making any more threatening statements or wanting to hurt herself."  Ex. 5 at 3:8–4:12; Ex. 6 at 5:16–6:3.  Although the 988 operator thought it was "kind of a 51/50," meaning it was a close call, he elected to warn the University about Plaintiff's statements.  Amend. Compl. ¶ 8.  For example, the 988 operator explained "she's not an immediate threat to herself or anybody else" and "even though we don't think that she was serious about the threats, we just don't want to leave any stone unturned. We dot the I's and cross the T's."  *Id.*; Ex. 6 at 4–5.  He also noted Plaintiff lacked the means to carry

---

[1]  988 phone calls are generally recorded.  Plaintiff attached numerous transcripts to the Amended Complaint, but neither party has presented the Court with a transcript of Plaintiff's original phone call with 988 on April 27.  *See* Amend. Compl. ¶¶ 8–9.  The parties dispute Plaintiff's precise words in her April 27 phone call and the context surrounding her statements in the May 1 phone call.  *Id.*  Nonetheless, the Court takes the allegations in the Amended Complaint as true at this stage.

out any harm and that her statements were "just more of her expression of . . . the episode that she was having." Ex. 6 at 11:18–12:4 ("She did report she had no means . . . . [S]he hadn't really formed a plan."); Amend. Compl. ¶¶ 7–11, 14; Ex. 9 at 2:6–19; 5:2–17; 12:10–22.

Upon learning of her statements, Terry Schofield, the deputy chief of police with the University, began discussing with a 988 operator whether they should place Plaintiff in protective custody because "she's definitely displaying homicidal and suicidal ideations" and Mr. Schofield knew "what she's getting at, yeet out, yeet them out, whatever . . . . it only leads to believe one thing of what she's talking about." *See* Ex. 10 at 4:15–7:17; 12:22–13:2.[2]  During his discussion, Plaintiff alleges Mr. Schofield "disclosed Plaintiff's mental health diagnoses, including general anxiety, PTSD, ADHD, and major depressive disorder" to the 988 operator.  Amend. Compl. ¶ 12.[3]

On May 7, 2024, Kalyn Cavazos, the Assistant Dean of Students & Director of Student Conduct, sent Plaintiff a letter explaining that she was expelled from the University because her statements to the 988 operator violated the University's Student Rights and Responsibilities Code (Code).  Ex. 3.  Specifically, Plaintiff violated § II.4.e, which prohibits:

> Threatening Behavior: A serious expression of intent to commit an act of unlawful violence against a particular individual, identifiable group, or damage to property. The threatening violence, including intimidation, causes reasonable fear of injury to the health or safety of any person, group, or property.

Ex. 1; Ex. 3; Amend. Compl. ¶ 57.  Plaintiff appealed the decision and was granted a formal hearing before a three-person panel that lasted approximately three and a half hours.  Amend. Compl.

---

[2]  Ultimately, Plaintiff was not taken into protective custody because by the time the Oklahoma City Police Department arrived at Plaintiff's apartment on May 1st, she "said she has no intentions of actually hurting anybody . . . she's just extremely frustrated."  Ex. 11 at 2:23–6:19.  Thus, "the exigent circumstances . . . had gone beyond a reasonable time."  Ex. 13 at 5:10–13.

[3]  To the extent these statements implicate Mr. Schofield, the Court also notes Exhibit 5 to the Amended Complaint indicates 988 was already aware of her diagnoses and additionally knew that "[s]he is receiving treatment, and medication is compliant."  Ex. 5 at 4:14–20.

¶¶ 25, 35, 37; Ex. 2.[4] At the start of the hearing, the chair of the panel informed the participants of various "ground rules of the hearing." *See* Ex. 14 at 4. For example, the chair's stated role was "to ensure that due process and basic fairness are being served for both parties involved." *Id.* The hearing was recorded but closed to the public. *Id.* And, although the chair admonished the participants that "this is not a court of law but an internal university hearing," the procedures included: opening and closing statements; honoring the rule of sequestration; requiring witnesses to affirm their testimony is truthful; enforcing a preponderance of the evidence standard of proof; giving probative value to evidence; excluding incompetent, irrelevant, immaterial, and unduly repetitious evidence; entertaining objections to the evidence; examining witnesses; deliberating in private; and considering aggravating and mitigating circumstances in assigning a penalty. *Id.* at 8–13.[5] Moreover, both parties were represented by counsel, and both parties retained the right to appeal the panel's decision. *Id.*

At the hearing, Plaintiff testified on her own behalf, and she was questioned regarding her statements to the 988 operators. Plaintiff testified that she never told 988 that she wanted to kill or harm Ms. Stanton, that she had no plan and no access to any means of harm (e.g., a gun), and that she was incapable of getting up from the floor. Amend. Compl. ¶¶ 28, 31. She also explained that by "destroy" she meant "I really wanted them to know that . . . if I were to hurt myself . . . it was because of all these pressures from school;" that when she used the phrase "yeet off the planet and yeet them all too" she meant she wanted "to let the news and medical schools know that it's

---

[4] The three-person panel consisted of various constituencies on campus, including one faculty member who served as the chair of the panel, one staff member, and one student representative. Ex. 14 at 2:3–12.

[5] However, Plaintiff alleges multi-layer hearsay evidence was introduced. Amend. Compl. ¶¶ 26–27.

because of this place;" and when she said she wanted Stanton "to pay in one way or another" she really meant that she wanted Stanton "to lose her career, lose her reputation, like I want to expose her." *Id.* ¶ 28, 32–33.

Both parties appealed the panel's one-year suspension to the University Vice President for Student Affairs and Dean of Students, David Surratt. *Id.* ¶¶ 36–37.  On appeal, Mr. Surratt stated he reviewed the record—including a video recording of the hearing, the exhibits, and the hearing panel decision—but nevertheless affirmed the suspension.  *Id.*; Mot. to Dismiss at 11.

Plaintiff has already completed her one-year suspension, but is currently proceeding through a residency application and has expressed concern regarding the possible stigma she will face if the suspension remains on her record.  Amend. Compl. ¶ 38–39; Resp. at 4.  Thus, Plaintiff asserts claims under 42 U.S.C. § 1983 for First and Fourteenth Amendment violations and under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, alleging she was improperly disciplined due to her statements to the confidential 988 Suicide Crisis Lifeline.  Defendants move to dismiss asserting, in part, lack of standing and entitlement to both absolute and qualified immunity.

## II.    <u>Standard of Review</u>

### A.  Subject-Matter Jurisdiction

Defendants argue that "any threat of future discipline is too speculative to confer standing."  Mot. to Dismiss at 9.  This assertion challenges the Court's subject-matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.  *See Murray v. Colorado*, 149 F. App'x 772, 774 (10th Cir. 2005).  A Rule 12(b)(1) motion seeking dismissal for lack of subject-matter jurisdiction takes the form of a facial attack or a factual attack.  *See Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Cont'l Carbon Co.*, 428 F.3d 1285, 1292 (10th Cir. 2005).  With a facial attack, such as the one made by the Defendants, the movant challenges

5

the sufficiency of the complaint, and the district court must accept all well-pleaded allegations in the complaint as true.  *See id.*; *Smith v. United States*, 561 F.3d 1090, 1097 (10th Cir. 2009).

### B.  Failure to State a Claim

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court accepts all well-pled factual allegations as true and views them in the light most favorable to the non-moving party.  *S.E.C. v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014).  That the Court accepts them as true, however, does not mean the allegations in a complaint are in fact true; a plaintiff is not required to prove his or her case at the pleading stage.  *See Glover v. Mabrey*, 384 F. App'x 763, 772 (10th Cir. 2010).  Rather, the complaint "must contain enough allegations of fact 'to state a claim to relief that is plausible on its face.'"  *Straub v. BNSF Ry. Co.*, 909 F.3d 1280, 1287 (10th Cir. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

While the court's "function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted," there are exceptions to the rule that a court may only consider facts alleged within the complaint when deciding a Rule 12(b)(6) motion. *Jacobsen v. Deseret Book Co.,* 287 F.3d 936, 941 (10th Cir. 2002) (internal quotation marks omitted).  Relevant here, "the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Id.*; *accord Smallen v. The W. Union Co.*, 950 F.3d 1297, 1305 (10th Cir. 2020).

### III.    Analysis: Plaintiff's § 1983 Claims

Plaintiff brings Counts I, II, and III under 42 U.S.C. § 1983, alleging violations of the First and Fourteenth Amendments of the Constitution of the United States.  To state a claim under § 1983 that will withstand a Rule 12(b)(6) motion to dismiss, plaintiff must allege "(1) a violation

6

of rights protected by the federal Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a 'person' (4) who acted under color of any statute, ordinance, regulation, custom, or usage, of any State." *Beedle v. Wilson*, 422 F.3d 1059, 1064 (10th Cir. 2005) (citation modified).  Plaintiff brings these claims against the University, the University Defendants in their official capacities, and the Individual Defendants in their individual capacities, seeking actual and punitive damages, injunctive relief, and attorney fees and costs. Amend. Compl. ¶¶ 79–83.

### A.  Claims brought against the University

As set forth above, a cause of action under § 1983 requires the deprivation of a civil right by a "person" acting under color of law.  42 U.S.C. § 1983; *McLaughlin v. Bd. of Trs. of State Colls. of Col.*, 215 F.3d 1168, 1172 (10th Cir. 2000).  The University, as an arm of the State, is not a person under § 1983. *See McLaughlin*, 215 F.3d at 1172; *Harris v. Champion*, 51 F.3d 901, 905–906 (10th Cir. 1995).  As such, Plaintiff's claims arising under § 1983 against the University fail and are dismissed with prejudice.  *Tufaro v. Oklahoma ex rel. Bd. of Regents of Univ. of Okla.*, 107 F.4th 1121, 1135 (10th Cir. 2024); *Knight v. Mooring Cap. Fund, LLC*, 749 F.3d 1180, 1190–91 (10th Cir. 2014).

### B.  Claims brought against the University Defendants

Plaintiff seeks injunctive relief requiring the University to: (1) expunge and permanently remove all documented notations, records, and any other materials related to her disciplinary incident and suspension from her educational and personal records; (2) refrain from reporting the suspension on Plaintiff's application materials for residency; (3) recharacterize Plaintiff's one-year suspension as an excused leave of absence; and (4) refrain from pursuing future disciplinary action against Plaintiff based on her statements to the 988 operator.  Amend. Compl. ¶ 79.  Defendants

argue the first three requests for relief are barred because they impermissibly seek retroactive relief. Mot. to Dismiss at 8. With respect to the fourth request for relief, Defendants instead argue Plaintiff lacks standing because the threatened injury is not "certainly impending." *Id.* at 9 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

### 1. Prospective Injunctive Relief

In suits for damages or retroactive injunctive relief, "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 61, 71 (1989); *see also Amaro v. New Mexico*, 737 F. App'x 882, 888-89 (10th Cir. 2018); *McLaughlin*, 215 F.3d at 1172. As such, Plaintiff's claims for damages and retroactive injunctive relief brought against the University Defendants in their official capacities fail to state a claim upon which relief can be granted under § 1983 and are dismissed with prejudice. *Tufaro*, 107 F.4th at 1135; *Knight*, 749 F.3d at 1190–91.

To the extent, however, Plaintiff brings claims for prospective injunctive relief against the University Defendants in their official capacities for an ongoing violation of federal law, those claims are not barred. *See Will*, 491 U.S. at 71 n.10 ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State.") (internal quotation marks omitted); *Ex parte Young*, 209 U.S. 123 (1908) (setting forth the doctrine that the Eleventh Amendment generally does not bar a suit against a state official in federal court that seeks only prospective equitable relief for violations of federal law, even if the state is immune).

Defendants argue the first three requests for relief are impermissibly retrospective because they address past violations rather than ongoing or future harms, citing *Buchwald v. Univ. of New Mexico Sch. of Med.*, 159 F.3d 487, 494 (10th Cir. 1998), for the proposition that modifying

59

academic records is barred retrospective relief. Mot. to Dismiss at 8. The Court disagrees. First, Defendants' reliance on *Buchwald* is misplaced. In *Buchwald*, a student sought an injunction ordering her immediate placement into the University of New Mexico School of Medicine after she was repeatedly denied admission in violation of the Constitution. *Buchwald*, 159 F.3d at 495. The Court noted the *Ex parte Young* exception is "a narrow one," but nonetheless concluded an order requiring her immediate placement into the School of Medicine was prospective even though it was based on the University's past violation of the Constitution. *Id.* As the Tenth Circuit explained in a footnote, "the existence of a past harm does not convert a prospective injunction into retrospective relief." *Id.* at 495 n.5. Second, the weight of authority cited by Plaintiff suggests the relief she seeks is prospective. *Doe Purdue Univ.*, 928 F.3d 652, 666 (7th Cir. 2019) (collecting cases and explaining that a "marred record is a continuing harm"); *see also Goss v. Lopez*, 419 U.S. 565, 567–71, 584 (affirming injunction requiring administrators to remove a suspension that could "seriously damage" the students' reputations and "interfere with later opportunities for higher education and employment"). Accordingly, the Court declines to dismiss Plaintiff's claims against the University Defendants to the extent she seeks prospective injunctive relief.

### 2. Standing

Turning to the fourth request for relief—prohibiting the University from pursuing future disciplinary action based on Plaintiff's prior statements to the 988 operator—Defendants move to dismiss under Fed. R. Civ. P. 12(b)(1), asserting Plaintiff lacks standing because the threatened injury is not "certainly impending." Mot. to Dismiss at 9. To establish Article III standing, the injury must be "[1] concrete, particularized, and actual or imminent; [2] fairly traceable to the challenged action; and [3] redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010).

Here, the Amended Complaint lacks any facts to suggest the injury is concrete, particularized, and actual or imminent. Indeed, there are no facts suggesting the University will revisit Plaintiff's suspension or otherwise pursue any other alternative grounds of discipline against Plaintiff based on her prior statements to the 988 operators. *Buchwald*, 1599 F.3d at 494 n.2. [6] Without more, and taking the facts alleged in the Amended Complaint as true, the Court finds Plaintiff lacks standing to seek relief restraining the University from pursuing future disciplinary action against Plaintiff based on her prior statements to the 988 operators.

### C. Claims brought against the Individual Defendants

The Individual Defendants present two defenses to the claims brought against them in their individual capacities: (1) they are protected by absolute immunity; and (2) they are protected by qualified immunity. Mot. to Dismiss at 10–24. The Court addresses each in turn.

#### 1. Absolute, Quasi-Judicial Immunity

In essence, Defendants invite the Court to extend absolute, quasi-judicial immunity to Individual Defendants Kalyn Cavazos and David Surratt because their functions as "prosecutor" and "appellate reviewer" are sufficiently analogous to the functions normally performed by a judge. *Id.* at 10–12. Even assuming the University's disciplinary scheme included adequate procedural safeguards, *see* discussion *infra* Section III.C.3(c), the Court concludes their functions were not sufficiently analogous to those of a neutral and detached judge to justify the extraordinary protection of absolute immunity.

---

[6] "Though seemingly paradoxical," the Tenth Circuit held the student lacked standing to seek an injunction "prohibiting *future* use of the disputed preference" for long-term New Mexico residents because Plaintiff failed to allege sufficient facts in her complaint that she intended to re-apply. *Buchwald*, 1599 F.3d at 493–94. The Court left to the district court's discretion whether the student could amend her complaint. *Id.* at 494 n.2.

Absolute immunity is a "strong medicine" that threatens to frustrate the remedial purposes of § 1983 litigation, which seeks to "deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Forrester v. White*, 484 U.S. 219, 230 (1988); *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). Thus, absolute immunity is the exception, not the norm. *Robinson v. Volkswagenwerk AG,* 940 F.2d 1369, 1370 (10th Cir.1991) ("Given the sparing recognition of absolute immunity by both the Supreme Court and this court, one claiming such immunity must demonstrate clear entitlement."); *Butz v. Economou*, 438 U.S. 478, 506–507 (1978) (limiting absolute immunity to "those exceptional situations" where it is "essential for the conduct of the public business"). Indeed, absolute immunity is reserved for officials whose functions are comparable to those of judges or prosecutors acting within the judicial process. *E.g., Rehberg v. Paulk*, 566 U.S. 356, 363 (2012) (discussing the "functional approach" in connection with witness immunity).[7]

Applying this functional approach, the Court finds Cavazos and Surratt did not act in a role comparable to a judicial officer. When the University held its disciplinary hearing to determine whether to suspend or expel Plaintiff, Kalyn Cavazos was the University's Director of Student Conduct and Assistant Dean of Students. Amend. Compl. at 3. At the hearing, Cavazos argued on

---

[7] The Tenth Circuit has adopted two benchmarks for determining whether absolute immunity should be extended to non-judicial officials. Under either approach, however, the Court is required to consider the official's functions. *Horwitz v. State Bd. of Med. Exam'rs of Colo.*, 822 F.2d 1508, 1513 (10th Cir. 1987) (creating a three-part formula: (1) the officials' functions must be similar to those involved in the judicial process, (2) the officials' actions must be likely to result in damages lawsuits by disappointed parties, and (3) there must exist sufficient safeguards in the regulatory framework to control unconstitutional conduct); *e.g., Moore v. Gunnison*, 310 F.3d 1315, 1317 (10th Cir. 2002) (adopting the Supreme Court's six-factor approach: (1) the need to assure that the individual can perform his functions without harassment or intimidation; (2) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (3) insulation from political influence; (4) the importance of precedent; (5) the adversary nature of the process; and (6) the correctability of error on appeal).

behalf of the University when she presented evidence, cross-examined witnesses, and gave opening and closing arguments. *Id.* ¶¶ 24–30; *see* Mot. to Dismiss at 11–12. Both Cavazos and Plaintiff appealed the panel's one-year suspension to the University Vice President for Student Affairs and Dean of Students, David Surratt, who stated he reviewed the record (a video recording, exhibits, and the panel's decision) but nevertheless affirmed the suspension. Amend. Compl. ¶¶ 36–37; Mot. to Dismiss at 11. Although the disciplinary hearing afforded ample procedural safeguards to satisfy the Due Process Clause, *see* discussion *infra* Section III.C.3(c), those safeguards do not justify the extraordinary extension of absolute, quasi-judicial immunity to University employees presiding over student disciplinary hearings. Unlike formal adjudicators operating under the Administrative Procedure Act or state licensing statutes, the proceeding in this case was governed by University policy and decided by a panel consisting of two University employees and a current student.[8] As a result, Cavazos and Surratt were "under obvious pressure to resolve a disciplinary dispute in favor of the institution" and therefore lacked the independence to function as judicial decisionmakers. *Cleavinger v. Saxner*, 474 U.S. 193, 204 (1985); *Moore,* 310 F.3d at 1318 (denying absolute immunity because review committee composed of institutional employees "lack[ed] the kind of independence typical of judicial bodies"). Because they were not neutral and detached adjudicators, but rather operated within the University's internal hierarchy, they are not entitled to absolute, quasi-judicial immunity.

---

[8] This case is distinguishable from *Guttman v. Khalsa*, 446 F.3d 1027 (10th Cir. 2006) in which the Tenth Circuit granted absolute, quasi-judicial immunity to a hearing officer and administrative prosecutor for their conduct in a New Mexico Board of Medical Examiners administrative hearing. The officials in *Guttman* were guided by state licensing statutes rather than internal institutional policies and their decision was subject to the "substantial evidence" and "arbitrary, capricious, or fraudulent" standard of review. *Guttman*, 446 F.3d at 1030.

63

## 2. Absolute Witness Immunity

Defendants assert Mr. Schofield is entitled to absolute immunity for his testimony at the disciplinary hearing because "[w]itnesses in judicial and quasi-judicial proceedings are entitled to absolute immunity from civil liability for their testimony." Mot. to Dismiss at 12 (citing *Briscoe v. LaHue*, 460 U.S. 325 (1983)). However, the Court need not fully decide this difficult question in this case. First, although the Amended Complaint states Mr. Schofield "misrepresent[ed]" events at the disciplinary hearing, Amend. Compl. ¶¶ 19, 30, Plaintiff asserts his testimony at the disciplinary hearing is not the basis for her claims. Resp. at 10–11.

Second, the Court need not consider Defendants' argument because it was raised only in a perfunctory and undeveloped manner. *See Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1122 (10th Cir. 2004) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"); *Beckham Cnty. Rural Water Dist. No. 3 v. City of Elk City*, No. CIV-05-1485-F, 2014 WL 12818160, at *13 (W.D. Okla. Mar. 28, 2014) ("[T]he court declines to undertake the research, to say nothing of the advocacy, necessary to support" the undeveloped contentions"). Here, Defendants devote only a few sentences to the issue and rely solely on *Briscoe v. LaHue*, 460 U.S. 325 (1983) without meaningfully explaining why its rationale should extend to an internal disciplinary proceeding. Mot. to Dismiss at 12. In *Briscoe*, the Supreme Court granted absolute witness immunity to a police officer who offered allegedly perjured testimony in a criminal trial. 460 U.S. at 327, 342–44. Defendants offer no analysis bridging that context to the one presented here. Instead, the entirety of Defendants' argument is the conclusory assertion that absolute witness immunity "should logically extend to administrative disciplinary hearings that afford procedural safeguards," such as requiring witnesses to testify under oath subject to potential discipline. Mot. to Dismiss at 12 n.4. Defendants provide no

13

authority applying *Briscoe* to "quasi-judicial proceedings," let alone an internal disciplinary proceeding, and offer no developed explanation why the presence of an oath warrants extending absolute immunity beyond the judicial context in which it arose.  Given this cursory treatment, the Court declines to develop Defendants' argument for them as to whether *Briscoe's* trial-witness immunity should be expanded to this materially different context.

### 3.  Qualified Immunity

Qualified immunity protects government officials, in their individual capacities, from liability for civil damages if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Once a defendant asserts qualified immunity in a motion to dismiss, the Court considers "(1) whether the facts that a plaintiff has alleged make out a violation of a constitutional right, and (2) whether the right at issue was clearly established."  *Keith v. Koerner*, 707 F.3d 1185, 1188 (10th Cir. 2013).  The Court may consider the two prongs of the qualified immunity test in either order.  *See id*.

### (a)  Count I: Free Speech

Plaintiff claims her confidential statements to the 988 operators constitute protected speech, while Defendants argue the statements fall within the "true threats" exception and therefore receive no constitutional protection.  Although it is a close case, at this stage of the proceedings, the Court agrees with Plaintiff.

Under the first prong of the qualified immunity test, the Court considers whether the facts alleged make out a violation of a constitutional right.  *Keith*, 707 F.3d at 1188 (10th Cir. 2013).  There is no dispute true threats do not qualify as speech protected by the First Amendment.  The Supreme Court defines true threats as "serious expression[s]" conveying that a speaker means to

"commit an act of unlawful violence." *Virginia v. Black*, 538 U.S. 343, 359 (2003). In 2023, the Supreme Court also added a subjective mens rea requirement to its true threats definition. *See Counterman v. Colorado*, 600 U.S. 66 (2023). Under *Counterman*, the University must show Plaintiff's subjective mental state was reckless—that is, that she "consciously disregarded a substantial risk that [her] communications would be viewed as threatening violence." *Id.* at 69, 77–79.

The Supreme Court's rationale for *Counterman* is critical in this case. *Counterman* sustained the necessity of an intent requirement, although recognizing that it "has a cost," because of "the likelihood that the absence of such a mens rea requirement will chill protected, nonthreatening speech." *Id.* at 72–73. In short, a speaker may "swallow words that are in fact not true threats" out of fear "of mistaking whether the statement is a threat." *Id.* at 78 (citation modified). In crafting the rule, the Supreme Court surveyed numerous other instances in which it added a subjective element in both civil and criminal cases involving speech. *Id.* at 75–78 ("The reasoning—and indeed some of the words—came straight from this Court's decisions insisting on a subjective element in other unprotected-speech cases, whether involving defamation, incitement, or obscenity.").

Here, there are ample factual allegations that, if true, speak to Plaintiff's subjective mental state. Most notably, Plaintiff testified on her own behalf at the disciplinary hearing and was questioned regarding her statements to the 988 operators. For example, Plaintiff testified that she never told 988 that she wanted to kill or harm Ms. Stanton, that she had no plan and no access to any means of harm (e.g., a gun), and that she was incapable of accomplishing any harm because she could not get up from the floor. Amend. Compl. ¶¶ 28, 31; Ex. 14. She also explained that by "destroy" she meant "I really wanted them to know that . . . if I were to hurt myself . . . it was

15
66

because of all these pressures from school," that when she used the phrase "yeet off the planet and yeet them all too" she meant she wanted "to let the news and medical schools know that it's because of this place," and when she said she wanted Stanton "to pay in one way or another" she really meant that she wanted Stanton "to lose her career, lose her reputation, like I want to expose her." Amend. Compl. ¶ 28, 32–33. Additionally, at the pleading stage, Plaintiff's allegation that she believed the conversation was confidential supports the inference that she lacked the constitutionally required mens rea. *Id.* ¶ 48. While experiencing a crisis, Plaintiff alleges she communicated her statements to what she understood to be a confidential crisis hotline—an outlet designed to invite individuals to express distressing thoughts so they may secure help. *Id.* ¶ 34 ("I called them to confidentially deescalate the intrusive thoughts, not to make threats . . . . I'm not a violent person. I feel like I've been misunderstood by everyone that I asked for help from.").

It is also worth noting that even the 988 operator concluded she was "not an immediate threat to herself or anybody else." *Id.* ¶ 8. And, although it was a close call, he elected to warn the University, in part, because "[w]e dot the I's and cross the T's." Ex. 6 at 4–5. Finally, Terry Schofield, the deputy chief of police with the University of Oklahoma, agreed that even though "saying I wish someone was dead . . . is ugly and not right to say," it is not a threat, "it's not hate speech, it's free speech." Ex. 8 at 10:21–11:7. Thus, taking the allegations in the Amended Complaint as true, the Court finds Plaintiff has alleged sufficient facts to establish a violation of a constitutional right so as to satisfy the first prong of the qualified immunity test.

The second prong of the qualified immunity test requires the Court to determine whether the right at issue was clearly established at the time of the alleged violation. *Keith*, 707 F.3d at 1188 (10th Cir. 2013). A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what [they are] doing violates that right." *Mullinex*

*v. Luna*, 577 U.S. 7, 12 (2012).  The Supreme Court has repeatedly admonished lower courts to refrain from defining clearly established law at a high level of generality.  *Id.* at 12. [9]  Thus, the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (citation modified).  Plaintiff is not required to provide "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011).

Here, the rule in *Counterman* was clearly established by the time Plaintiff was suspended. Although *Counterman* arose in the criminal context, its holding applies with equal force in civil cases.  *Counterman*, 600 U.S. at 76 ("[T]he First Amendment precludes punishment, whether civil or criminal, unless the speaker's words were 'intended' (not just likely) to produce imminent disorder."); *see Mckesson v. Doe*, 144 S. Ct. 913, 218 (2024) (denying writ of certiorari on April 15, 2024 in civil negligence case and instructing lower courts to "give full and fair consideration to arguments regarding *Counterman's* impact").  Nor does the absence of a case applying *Counterman* in the precise context presented here defeat clearly established law.  The Supreme Court has held that officials may be on notice that their conduct is unlawful even in novel factual circumstances where existing precedent applies with "obvious clarity" to the conduct at issue. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

---

[9]  The Court is not persuaded by Defendants' reliance on *Sanchez v. Guzman*, 105 F.4th 1285, 1293 (10th Cir. 2024), to suggest that "[e]ven seminal Supreme Court cases on particular points of law do not by themselves create clearly established law outside an obvious case."  Reply at 2 (citation modified).  As the decision explains, that observation arises in the context of Fourth Amendment excessive force cases where landmark cases like *Tennessee v. Garner* and *Graham v. Connor* are cast at a high level of generality and do not necessarily provide guidance for each unique setting in which an officer is required to make "split-second decisions." *Sanchez v. Guzman*, 105 F.4th 1285, 1293 (10th Cir. 2024).  Thus, *Sanchez* does not create a bright line rule that Supreme Court precedent cannot clearly establish the law—particularly where, as is the case here, the violation is not the product of a split-second decision.

Accordingly, because Plaintiff's allegations in the Amended Complaint satisfy both prongs of the qualified immunity test, her free-speech claim survives Defendants' Motion to Dismiss.

### (b)    Count II: Vagueness

Plaintiff's second § 1983 claim alleges the University's Student Rights and Responsibilities Code is unconstitutionally vague as applied and therefore violates the First and Fourteenth Amendments.  Under the Due Process Clause of the Fourteenth Amendment, a regulation is impermissibly vague only if it fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  Vague provisions are particularly problematic where they regulate speech protected by the First Amendment because uncertainty may cause individuals to "steer far wider of the unlawful zone" and refrain from lawful expression.  *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964); *see also id.* at 253–54.  Nonetheless, absolute precision is not required; rather, a regulation is sufficiently definite if its meaning can be understood through common usage and ordinary interpretation.  *See United States v. Williams*, 553 U.S. 285, 304 (2008).  Courts also consider whether the challenged language incorporates well-established legal concepts that provide objective guidance.  *Id.*

Defendant argues the Code "squarely meets this standard."  Mot. to Dismiss at 17.  The Court agrees.  Here, the Code prohibits "threatening behavior," which is defined as:

> A serious expression of intent to commit an act of unlawful violence against a particular individual, identifiable group, or damage to property. The threatening violence, including intimidation, causes reasonable fear of injury to the health or safety of any person, group, or property.

Ex. 1; Ex. 3; Amend. Compl. ¶ 57.  That definition aligns with the Supreme Court's articulation of "true threats" in *Counterman* nearly verbatim.  600 U.S. at 74 ("True threats are serious expressions conveying that a speaker means to commit an act of unlawful violence.") (citation

modified). Because the Code incorporates this established legal standard, it provides meaningful notice of the type of speech it prohibits. The requirement that the statement constitute a "serious expression of intent" to commit "unlawful violence" significantly narrows the rule's scope and distinguishes punishable threats from protected rhetoric, exaggeration, or political hyperbole. *See, e.g., Watts v. United States*, 394 U.S. 705, 708 (1969).

Plaintiff's concern is twofold. First, she alleges the Code failed to provide notice that "her statements made in confidence to 988 when seeking mental health counseling would constitute a violation." Amend. Compl. ¶¶ 54–61. Plaintiff's focus on the expected confidentiality of her statements, however, is misguided. For vagueness purposes, the relevant question is whether a student of ordinary intelligence would understand that such statements, whether shared in confidence or not, could violate the Code. Given the rule's incorporation of the well-established "true threat" standard, the Court concludes the Code provides students with sufficient notice of that boundary.

Second, Plaintiff argues the Code has "such a broad and unforeseeable scope" that it invites discriminatory enforcement. *See id.* ¶ 56. The Court disagrees. The Code contains several objective limitations: the threat must involve unlawful violence, it must be directed at a particular individual, identifiable group, or property, and it must be serious enough to cause reasonable fear of harm. Importantly, the Code does not regulate speech based on its viewpoint or general offensiveness; it targets only speech that communicates a genuine threat of violence. In short, a student of ordinary intelligence reading the provision would understand that the Code prohibits statements that seriously express an intent to commit unlawful violence against a person, group, or property.

Because the facts, taken as true, do not make out a violation of a constitutional right under the first prong of the qualified immunity test, the Court dismisses Plaintiff's Count II claim with prejudice. *Knight*, 749 F.3d at 1190–91.

### (c)    Count III: Procedural Due Process

Plaintiff's third § 1983 claim alleges she had a protected liberty or property interest in her right to pursue higher education and professional licensure and she was deprived of that interest without constitutionally adequate procedures. *Id.* at ¶¶ 62-69. This claim does not survive a motion to dismiss under the first prong of the qualified immunity test.

The Supreme Court's decision in *Goss v. Lopez,* 419 U.S. 565 (1975) sets the standard for procedural due process owed to students facing short-term school suspensions. Under *Goss*, if the suspension is ten days or less, the student must be given "oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Goss,* 419 U.S. at 581, 95 S.Ct. 729. It is undeniable that Plaintiff received at least the minimum due process required by *Goss*. Ex. 3 (written notice); Ex. 14 (opportunity to be heard).

The *Goss* court further explained, however, that "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." *Goss,* 419 U.S at 584. Although *Goss* does not identify the requisite "formal procedures" with specificity, this is not a close case. As described above, Plaintiff received extensive procedural protections, including a three and a half hour formal hearing that involved an opportunity to examine witnesses, introduce evidence subject to various evidentiary protections, representation by counsel, and a multi-level appeal process. Mot. to Dismiss at 18–19; Amend. Compl. ¶¶ 36–37; *see Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1242 (10th Cir. 2001) (citing the First and Sixth Circuits and

20

71

casting doubt on whether students are even entitled to the safeguards Plaintiff was afforded such as the right to counsel and the right to cross-examine witnesses).

Although some hearsay evidence was admitted, Resp. at 27–28, Plaintiff was permitted to testify on her own behalf and "[a]ll that is necessary" to satisfy due process "is that the procedures be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard,' to insure that they are given a meaningful opportunity to present their case." *Mathews,* 424 U.S. 319, 349 (1976) (quoting *Goldberg v. Kelly,* 397 U.S. 254, 268–69 (1970)).  Accordingly, the Court concludes Plaintiff received ample procedural safeguards, and her third cause of action is therefore dismissed with prejudice.   *Knight*, 749 F.3d at 1190–91.

## IV.    <u>Analysis: Plaintiff's discrimination claim</u>

The Court next addresses Plaintiff's claim under the Rehabilitation Act of 1973, 29 U.S.C. § 794, which prohibits discrimination on the basis of disability by programs or activities receiving federal financial assistance.

To state a claim, plaintiff must plausibly allege: (1) she is disabled; (2) she is otherwise qualified to participate in the program; and (3) she was excluded from participation in, denied the benefits of, or subjected to discrimination under the program solely by reason of her disability. 29 U.S.C. § 794(a); *Hollonbeck v. U.S. Olympic Comm.*, 513 F.3d 1191, 1194 (10th Cir. 2008).  The parties do not dispute the first element because Plaintiff was registered with the University's disability accommodations office due to diagnoses of generalized anxiety disorder, major depressive disorder, and ADHD.  Amend. Compl. ¶ 1; Mot. to Dismiss at 22; Resp. at 30.

Defendants argue Plaintiff failed to establish the second and third elements.  Because the Court agrees that the Amended Complaint fails to satisfy the third element, the Court declines to address the second.  In sum, the Amended Complaint alleges each of the Defendants discriminated

against Plaintiff because of her disabilities.  First, Mr. Schofield "disclosed Plaintiff's mental health diagnoses" to the 988 operator.  Amend. Compl. ¶ 12.  Second, Ms. Cavazos stated during her opening statement at the disciplinary hearing that she has "to deal with threats to our campus community more often than I'd like to, and they are typically tied to a person experiencing mental distress."  *Id.* ¶ 25.[10]  Third, the University failed to provide reasonable accommodations and penalized Plaintiff for "behavior that was a manifestation of her disabilities."  *Id.* ¶ 74.  And fourth, Mr. Surratt was aware of all these facts and still chose to affirm the panel's decision. *Id.* ¶¶ 36–37.

Even accepting these allegations as true, the Amended Complaint does not plausibly allege that Defendants acted solely by reason of Plaintiff's disabilities.  To the contrary, Plaintiff's own allegations establish that the disciplinary action was based on a legitimate, non-discriminatory basis because the hearing panel's conclusion focused on her "threatening behavior" that violated the University's Student Rights and Responsibilities Code.  *Id.* ¶¶ 22; Ex. 3.  Moreover, Plaintiff's allegation that she was penalized for a "manifestation" of her disability is dispositive.  Amend. Compl. ¶ 74.  The Rehabilitation Act does not prohibit an institution from disciplining misconduct simply because it may be related to a disability.  As the Tenth Circuit explained in *Williams v. Widnall*, an official may take action based on "egregious behavior," even when that behavior is alleged to be "an attribute caused by the handicap and not the handicap itself."  79 F.3d 1003, 1006–07 (10th Cir. 1996) (upholding termination of an employee despite employee's claim that his threats were a direct result of his disability).

---

[10]  Immediately following this statement, Ms. Cavazos also elaborated that it "is standard for me to ensure a time of separation happens for the involved student to, A, get the necessary treatment and help that they need, B, have adequate time to reflect on their actions and how it affected and impacted others, and C, provide time for the person, group of individuals, or office to get back into their normal routines."  Ex. 14 at 20–21.

Because the Amended Complaint, even when viewed in the light most favorable to Plaintiff, does not plausibly allege that Defendants discriminated against her solely by reason of her disability, Plaintiff's fourth cause of action is dismissed with prejudice. *Knight*, 749 F.3d at 1190–91.

## V.    Conclusion

Based on the foregoing, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion to Dismiss [Doc. No. 36]. Plaintiff's § 1983 claims alleged in Counts II and III, and Plaintiff's Rehabilitation Act claim alleged in Count IV are dismissed with prejudice. Plaintiff's Count I claim against the University is likewise dismissed with prejudice. Additionally, the Court FINDS that Plaintiff lacks standing, based on the facts alleged in the Amended Complaint, to seek relief restraining the University Defendants from pursuing future disciplinary action against Plaintiff based on her prior statements to the 988 operators. Thus, Plaintiff's only surviving claim is her Count I claim against: (a) the University Defendants sued in their official capacities, but only to the extent Plaintiff seeks prospective injunctive relief; and (b) the Individual Defendants sued in their individual capacities.

IT IS SO ORDERED this 13th day of March, 2026.

BERNARD M. JONES, II
UNITED STATES DISTRICT JUDGE

23
74

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

MEGAN HSIEH,                              )
                                         )
            Plaintiff,                   )
                                         )
v.                                       )    Case No. CIV-25-1160-J
                                         )
STATE OF OKLAHOMA ex rel.,               )
THE BOARD OF REGENTS for the             )
UNIVERSITY OF OKLAHOMA, et al.,          )
                                         )
            Defendants.                  )

## ORDER

This case arises out of Plaintiff's one-year suspension from the University of Oklahoma Health Sciences Center based on allegations that she made threatening statements while experiencing a mental health crisis. In October 2025 the Court denied Plaintiff's request for a Temporary Restraining Order, in part, because Plaintiff could not show irreparable harm since she had not yet applied for residency and her injury was entirely theoretical [Doc. No. 16]. As set forth in the Order on Defendants' Motion to Dismiss [Doc. No. 47], issued contemporaneously with this Order [Doc. No. 48], the Court determined: (a) Plaintiff's only surviving claim is her First Amendment claim against (i) David A. Surratt and Kalyn Cavazos sued in their official capacities (the University Defendants), but only to the extent Plaintiff seeks prospective injunctive relief and (ii) David A. Surratt, Kalyn Cavazos, and Terry Schofield sued in their individual capacities (the Individual Defendants); and (b) Plaintiff lacks standing, based on the facts alleged in the Amended Complaint, to seek relief restraining the University Defendants from pursuing future disciplinary action against Plaintiff based on her prior statements to the 988 operators.

Now before the Court is Plaintiff's Motion for Preliminary Injunction [Doc. No. 43] and Brief in Support [Doc. No. 44] (Mot. for Prelim. Inj.), filed February 8, 2026. Defendants filed a

75

response [Doc. No. 45] (Resp.), and Plaintiff replied [Doc. No. 46] (Reply).  For the reasons set forth below, Plaintiff's Motion for Preliminary Injunction is DENIED.

## I.     Background

In 2024, Plaintiff experienced a mental health crisis, prompting her to contact the 988 Suicide and Crisis Lifeline, which provides "free and confidential emotional support to people in suicidal crisis or emotional distress."  Amend. Compl. ¶¶ 1, 5–6.  In her phone calls with the 988 operators on April 27 and May 1, Plaintiff made numerous statements that are the central focus of this litigation.[1]  For example, she stated: (a) she "wished that [Kate Stanton, an administrator at the University] would die" and that she wanted other administrative staff at the medical school to die; (b) "I am so tired and done; I want to rip my head off" and "leave a note to the news at the school and let them know that it's this place's fault and destroy the school in the process;" (c) "I want to end it all at the school, five minutes before post it to the news, tell other med schools, and take the administration with me;" (d) "[I want to] yeet off the planet and yeet them [the administrators] too;" and (e) "I want her to pay in one way or another, and I want the school to pay in one way or another."  *Id.* ¶¶ 8, 32, 33; Amend. Compl. Ex. 9.

During the April 27 phone call, the 988 operator was "able to stabilize" Plaintiff and create a "safety plan for her," so that by the end of the call she was "not making any more threatening statements or wanting to hurt herself."  Amend. Compl. Ex. 5 at 3:8–4:12; Amend. Compl. Ex. 6 at 5:16–6:3.  Although the 988 operator thought it was "kind of a 51/50," meaning it was a close call, he elected to warn the University about Plaintiff's statements.  Amend. Compl. ¶ 8.  For

---

[1] 988 phone calls are generally recorded.  Plaintiff attached numerous transcripts to the Amended Complaint, but neither party has presented the Court with a transcript of Plaintiff's original phone call with 988 on April 27.  *See* Amend. Compl. ¶¶ 8–9.  The parties dispute Plaintiff's precise words in her April 27 phone call and the context surrounding her statements in the May 1 phone call.  *Id.*

example, the 988 operator explained "she's not an immediate threat to herself or anybody else" and "even though we don't think that she was serious about the threats, we just don't want to leave any stone unturned. We dot the I's and cross the T's." *Id.*; Amend. Compl. Ex. 6 at 4–5. He also noted Plaintiff lacked the means to carry out any harm and that her statements were "just more of her expression of . . . the episode that she was having." Amend. Compl. Ex. 6 at 11:18–12:4 ("She did report she had no means . . . . [S]he hadn't really formed a plan."); Amend. Compl. ¶¶ 7–11, 14; Amend. Compl. Ex. 9 at 2:6–19; 5:2–17; 12:10–22.

By May 1, 2024, Terry Schofield, the deputy chief of police with the University of Oklahoma, agreed that even though "saying I wish someone was dead . . . is ugly and not right to say," it is not a threat, "it's not hate speech, it's free speech." Amend. Compl. Ex. 8 at 10:21–11:7. Nonetheless, Mr. Schofield asked 988 to follow up with Plaintiff, explaining "we don't want her to know that you guys called us and told us what she said" because that could dissuade Plaintiff from relying on 988 during a future crisis. *Id.* at 6:6–24; 18:21–19:8. In the follow-up call, the operator expressed sympathy for Plaintiff's situation and inquired: "So, with all that, it hasn't brought you any, you know, harmful thoughts or anything like that?" Amend. Compl. Ex. 9 at 8–9. To which Plaintiff replied: "Sure as hell did the day that I called. No. Like clearly like nothing to do it with. But . . . ." *Id.*

On May 7, 2024, Kalyn Cavazos, the Assistant Dean of Students & Director of Student Conduct, sent Plaintiff a letter explaining that she was expelled because her statements to the 988 operator violated the University's Student Rights and Responsibilities Code, which prohibits threatening behavior. Amend. Compl. Ex. 3; Amend. Compl. ¶ 57. Plaintiff appealed the decision and was granted a formal hearing before a three-person panel that lasted approximately three and a half hours. Amend. Compl. ¶¶ 25, 35, 37; Ex. 2. At the hearing, Plaintiff testified that she never

told 988 that she wanted to kill or harm Ms. Stanton, that she had no plan and no access to any means of harm (e.g., a gun), and that she was incapable of getting up from the floor.  Amend. Compl. ¶¶ 28, 31.  She also explained that by "destroy" she meant "I really wanted them to know that . . . if I were to hurt myself . . . it was because of all these pressures from school;" that when she used the phrase "yeet off the planet and yeet them all too" she meant she wanted "to let the news and medical schools know that it's because of this place;" and when she said she wanted Stanton "to pay in one way or another" she really meant that she wanted Stanton "to lose her career, lose her reputation, like I want to expose her."  *Id.* ¶ 28, 32–33.

Plaintiff has already completed her one-year suspension but is currently proceeding through a residency application and has expressed concern regarding the possible stigma she will face if the suspension remains on her record.  Amend. Compl. ¶ 38–39; Mot. for Prelim. Inj. at 4–5.  Thus, Plaintiff asserts a claim under 42 U.S.C. § 1983 for a First Amendment violation, alleging she was improperly disciplined due to her statements to the confidential 988 Suicide Crisis Lifeline.  Plaintiff seeks injunctive relief requiring the University to: (1) expunge and permanently remove all documented notations, records, and any other materials related to her disciplinary incident and suspension from her educational and personal records; (2) refrain from reporting the suspension on Plaintiff's application materials for residency; and (3) recharacterize Plaintiff's one-year suspension as an excused leave of absence.  Amend. Compl. ¶ 79; [Doc. No. 43 at 2].

## II.  **Legal Standard**

Federal Rule of Civil Procedure 65 authorizes a district court to issue a preliminary injunction.  *See* Fed. R. Civ. P. 65(a).  A preliminary injunction is an "extraordinary" equitable remedy that is "never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt.*

*Consultants, Inc.,* 883 F.2d 886, 888–89 (10th Cir. 1989) ("Because it constitutes drastic relief to be provided with caution, a preliminary injunction should be granted only in cases where the necessity for it is clearly established."). Its purpose "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

The default rule is that a plaintiff seeking a preliminary injunction must make a clear showing that "[1] he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20; *see also Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010).[2] The issuance of a preliminary injunction rests "within the sound discretion of the trial court." *Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 805 F.2d 351, 354 (10th Cir. 1986).

III.    <u>Analysis</u>

A. **Likelihood of Success on the Merits**

In its Order addressing Defendants' Motion to Dismiss [Doc. No. 47], the Court recognized that Plaintiff's First Amendment claim presented a "close case," yet declined to dismiss it at the pleading stage, noting that all well-pled factual allegations must be accepted as true and viewed in the light most favorable to the non-moving party. While this standard is appropriate for evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the standard is markedly higher when considering a motion for a preliminary injunction. At this stage, the plaintiff must

---

[2] Defendants argue for a "heavier burden" or "strong showing" standard because the injunctive relief Plaintiff seeks qualifies as a "disfavored" injunction that: (1) mandates action; (2) changes the status quo; or (3) grants all the relief the moving party could expect to win from trial. Resp. at 2. The Court declines to apply the heightened standard, however, because the Court determines Plaintiff cannot meet even the more relaxed standard.

79

establish more than well-pled allegations; she must demonstrate a likelihood of success on the merits. *See Winter* 555 U.S. at 20; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Indeed, "[i]n First Amendment cases, the likelihood of success on the merits will often be the determinative factor." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (citation modified).

At issue in this case is whether Plaintiff's statements to the 988 operators qualify as a true threat. Specifically, whether the Defendants can show Plaintiff's subjective mental state was reckless—that is, that she "consciously disregarded a substantial risk that [her] communications would be viewed as threatening violence." *Counterman v. Colorado*, 600 U.S. 66, 69, 77–79 (2023). Here, the evidence weighs against Plaintiff's likelihood of success. Plaintiff's own statements during the May 1 follow-up call, in which she admitted that she "[s]ure as hell did" experience "harmful thoughts or anything like that" during her first phone call, directly contradict her testimony at the disciplinary hearing. Amend. Compl. Ex. 9 at 8–9. This inconsistency calls into question whether she possessed the requisite intent at the time she made the statements to the 988 operator during the April 27 phone call.

Second, Defendants raise an alternative theory that the University "possess[es] an inherent right to discipline students." Resp. at 4. Courts have repeatedly held that speech that materially disrupts the functioning of a school is not protected under the First Amendment. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513 (1969) (student expression may be limited if it materially disrupts school operations); *Mahanoy Area Sch. Dist. v. B. L.*, 594 U.S. 180, 188 (2021) (noting "several types of off-campus behavior that may call for school regulation" including "threats aimed at teachers or other students"); *Slaughter v. Brigham Young Univ.*, 514 F.2d 622, 626 (10th Cir. 1975). Here, it is undisputed that Plaintiff's speech caused tangible disruption.

Nonessential staff were sent home, access to the Student Union Building was restricted, and an optional graduation event for seniors was cancelled.  Amend. Compl. ¶ 20; Resp. at 4.

Taken together, these facts indicate that Plaintiff faces significant challenges in establishing a likelihood of success on the merits, a threshold requirement for preliminary injunctive relief. Thus, this factor favors Defendants.

### B. Irreparable Harm

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, (1976).  As explained in the preceding section, however, Plaintiff has failed to demonstrate the requisite likelihood of success on her free speech claim.  As a result, she is not entitled to a presumption of irreparable injury. *Schrier v. Univ. of Co.*, 477 F.3d 1253, 1266 (10th Cir. 2005).  Nonetheless, a plaintiff satisfies the irreparable harm requirement by showing "a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." *RoDa Drilling Co. v. Siegal,* 552 F.3d 1203, 1210 (10th Cir.2009) (citation modified).  Purely speculative harm will not suffice, but "[a] plaintiff who can show a significant risk of irreparable harm has demonstrated that the harm is not speculative and will be held to have satisfied this burden." *Id.* (citation modified).

As a preliminary matter, the Court agrees with Plaintiff that her purported injury is imminent.  Mot. for Prelim. Inj. at 6.  It is undisputed that Plaintiff seeks to apply for residency positions in the Supplemental Offers and Acceptance Program (SOAP) that will occur during the week of March 16, 2026.  [Doc. No. 43 at 1].  The Court also agrees that the irreparable harm factor tips in favor of Plaintiff, but it is a close case for a few reasons.  The starting point is strong precedent in Plaintiff's favor.   Both the United States Supreme Court and this Court have recognized a suspension could "seriously damage" a student's reputation and "interfere with later

opportunities for higher education and employment." *See Goss v. Lopez*, 419 U.S. 565, 567–71, 584; *Ritter v. Oklahoma*, No. CIV-16-0438-HE, 2016 WL 2659620 (W.D. Okla. May 6, 2016); *J.C. v. Laverne Pub. Sch. Dist.*, No. CIV-18-197-M, 2018 WL 1661863 (W.D. Okla. Apr. 5, 2018). It is important, however, to situate this general rule within the context of how Plaintiff's suspension will be reported in her residency application.

To begin, the Court is not convinced that Plaintiff will suffer "permanent exclusion from her profession" or that she "***cannot*** realistically apply" for a residency program because of her suspension. Mot. for Prelim. Inj. at 4, 23. Defendants acknowledge that the suspension notation "may affect Plaintiff's residency prospects to some degree," Resp. at 16, and Plaintiff has presented compelling evidence suggesting it has already made certain volunteer opportunities more difficult to obtain, and that residency programs can apply a built-in filter to screen out her application. Mot. for Prelim. Inj. at 4–5, Exs. 1, 5, 7. But a reduced prospect does not equate to a categorical bar from pursuing her chosen profession.

Notwithstanding the possibility of reduced prospects, the Court also considers how that information will appear in the residency application process and how programs are likely to evaluate it. Plaintiff's application packet includes components authored by Plaintiff (e.g., Mot. for Prelim. Inj. Ex. 2) and components authored by the University (e.g., Mot. for Prelim. Inj. Exs. 3–4). *See also* Resp. at 12 n.3. In the student-authored portion, Plaintiff must disclose whether she has had a professionalism sanction or any other adverse action by her school, but she is also given the opportunity to "explain the reason, timeframe, what steps [she] took to address it, and what [she] learned from it." Ex. 2. Evidence in the record further indicates that "residency programs conduct holistic reviews of applicants," considering numerous factors including "what the applicant has done since the event in question." Resp. Ex. 3 ¶¶ 4–5.

The University-authored materials include the student's transcript and the so-called "Dean's Letter" or "Medical Student Performance Evaluation Letter." Resp. at 12 n.3. The transcript reflects a gap in enrollment from May 2024 to May 2025 but does not provide any substantive explanation for the gap. Resp. Ex. 1 at 2. In the Dean's Letter, the University is asked two questions: (1) Identify any "[e]xtensions, leaves of absence, breaks in the educational program" and (2) Was this student the recipient of any adverse actions by the medical school? Mot. for Prelim. Inj. Ex. 4. The University's answer to both is identical: "Yes; Megan was suspended from the program for one year. She has successfully completed all requirements and has performed well since her return to the program." *Id.* As Defendants point out, this answer makes no reference to "threatening behavior" and therefore leaves it up to Plaintiff to contextualize the events leading to her suspension. *See* Resp. at 12.

Because Plaintiff's application may be screened out by some residency programs and Courts have acknowledged a suspension notation can create irreparable harm, the Court determines this factor weighs in favor of Plaintiff. However, the Court recognizes the University-authored portion of the application states Plaintiff has "performed well since her return to the program," makes no reference to the underlying reasons for her suspension, and instead allows Plaintiff to remove the sting by supplying the details, including the steps she took to address it, the lessons she learned, and how the experience might strengthen Plaintiff's ability to serve her patients.

### C. Balance of the Equities & Public Policy

Here, the balance-of-equities and public-interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009); Mot. for Prelim. Inj. at 24; Resp. at 21. The Court determines both factors favor the University because Plaintiff's requested injunction would require far more than a simple record edit. Removing the disciplinary notation and representing Plaintiff's leave as excused would

effectively compel the University to certify to residency programs that no disciplinary action occurred—information that would be incomplete and misleading because a disciplinary proceeding, violation finding, and suspension did in fact occur. *See* Resp. at 21–22, 24. Such an order would force the University to provide inaccurate facts relied upon by residency programs in decisions affecting patient care and public safety. *Id.* It would also risk lasting reputational harm to the University and undermine the credibility of its communications for all future applicants, harming other students who depend on the integrity of those records. Resp. Ex. 3 ¶ 10 (suggesting that if Plaintiff ultimately does not prevail, "the University would need to contact every program that received the incomplete record and correct it").

Plaintiff's countervailing concern is that students might be discouraged from seeking mental health support if they believe statements made to a crisis hotline could later result in discipline. Mot. for Prelim. Inj. at 24. While the Court takes that concern seriously, that speculative possibility does not outweigh the concrete harms that would result from compelling the University to provide incomplete or misleading information to residency programs and the broader medical profession. The public interest is better served by preserving the accuracy and reliability of institutional records while the Court resolves the underlying constitutional questions on a full record.

## IV.    Conclusion

Based on the foregoing, the Court DENIES Plaintiff's Motion for Preliminary Injunction [Doc. Nos. 43–44].

IT IS SO ORDERED this 13th day of March, 2026.

BERNARD M. JONES, II
UNITED STATES DISTRICT JUDGE

11