**Case No. 26-6052**

# IN THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

MEGAN HSIEH,

*Plaintiff-Appellee,*

v.

DAVID A. SURRATT, KALYN CAVAZOS, and TERRY SCHOFIELD,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Western District of Oklahoma
Honorable Bernard M. Jones, District Judge
Case No. CIV-2025-1160-J

# BRIEF OF *AMICUS CURIAE* FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION IN SUPPORT OF APPELLEE AND AFFIRMANCE

Ronald G. London
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
(215) 717-3473
ronnie.london@fire.org

Counsel for *Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amicus curiae* Foundation for Individual Rights and Expression certifies that (1) *amicus* does not have any parent corporations, and (2) no publicly held companies hold 10% or more of the stock or ownership interest in *amicus*. *Amicus* is a nonprofit corporation exempt from income tax under Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3).

## TABLE OF CONTENTS


CORPORATE DISCLOSURE STATEMENT .......................................... i

TABLE OF AUTHORITIES ................................................................ iii

INTEREST OF *AMICUS CURIAE* .......................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................... 3

ARGUMENT.................................................................................................. 7

I. *Counterman* Applies to State Action That Punishes or Chills Speech. ........................................................................................... 7

  A. *Counterman* announced a constitutional standard, not a criminal one ........................................................................... 8

  B. *Counterman* relied heavily on *Sullivan*'s reckless disregard test from civil defamation. .................................... 11

  C. *Counterman* declined to adopt petitioner's suggestion that its rule be limited to criminal statutes. ........................ 13

II. FIRE's Experience Defending Campus Speech Demonstrates the Need for *Counterman*'s Reckless Disregard Test in Civil Cases. ........................................................................................... 16

CONCLUSION ............................................................................................ 23

CERTIFICATE OF COMPLIANCE ........................................................ 25

CERTIFICATE OF SERVICE ................................................................. 26

## TABLE OF AUTHORITIES

**Cases**

*Counterman v. Colorado*,
600 U.S. 66 (2023) .......... 1, 4–16, 18, 19, 23

*Elonis v. United States*,
575 U.S. 723 (2015) .......... 10

*Elrod v. Burns*,
427 U.S. 347 (1976) .......... 15

*Gertz v. Robert Welch*,
418 U.S. 323 (1974) .......... 12

*Grutter v. Bollinger*,
539 U.S. 306 (2003) .......... 17

*Healy v. James*,
408 U.S. 169 (1972) .......... 17

*Keyishian v. Bd. of Regents, State Univ. of N.Y.*,
385 U.S. 589 (1967) .......... 17

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964) .......... 5–7, 11, 14

*Philadelphia Newspapers, Inc. v. Hepps*,
475 U.S. 767 (1986) .......... 11

*Rankin v. McPherson*,
483 U.S. 378 (1987) .......... 22

*Sweezy v. New Hampshire*,
354 U.S. 234 (1957) .......... 17

*United States v. Heineman*,
767 F.3d 970 (10th Cir. 2014) .......... 8

*United States v. Wheeler*,
776 F.3d 736 (10th Cir. 2015) .......... 8

*Watts v. United States*,
394 U.S. 705 (1969) ........................................................ 19, 22

*Widmar v. Vincent*,
454 U.S. 263 (1981) ........................................................ 17

**Statutes**

18 U.S.C. § 875(c) ........................................................ 10

Colo. Rev. Stat. § 18-3-602(1)(c) (2022) ........................................ 9

Utah Code § 76-5-107.3 ........................................................ 19

**Other Authorities**

FIRE, *University of Utah: Student Arrested, Investigated, Then Cleared for Nuclear Meltdown Joke* ........................................ 20

FIRE, *Victory: College settles with 'antifa' professor fired for criticizing President Trump on Facebook, avoids First Amendment lawsuit from FIRE* (Apr. 27, 2020) ........................ 23

Jackie Bond, *U.Va. alumna settles First Amendment lawsuit against the University after her expulsion in abeyance*, The Cavalier Daily (Feb. 28, 2024) ........................................ 21

Letter from Adam B. Steinbaugh, Director, FIRE, to Dr. Lori Sundberg, President, Kirkwood Community College (Aug. 27, 2019) ........................................................ 22, 23

Letter from Adam B. Steinbaugh, Senior Program Officer, FIRE, to Mark J. Fleming, University Counsel, Montclair State University (Aug. 4, 2017) ........................................ 22

Letter from Alex Morey, Director, FIRE, to Sim Gill, District Attorney, Salt Lake County (Sept. 23, 2022) ........................ 19

Letter from James E. Ryan, President, University of Virginia, to Adam B. Steinbaugh, Director, FIRE (Aug. 18, 2021) ................ 21

Letter from Sabrina Conza, Program Analyst, FIRE, to James E. Ryan, President, University of Virginia (July 27, 2021) .............. 20, 21

Lyrissa Barnett Lidsky & Linda Riedemann Norbut, *#IU: Considering the Context of Online Threats*, 106 Calif. L. Rev. 1885 (2018) .............................................................................. 19

Transcript of Oral Argument, *Counterman v. Colorado*, 600 U.S. 66 (2023) (No. 22-138) ........................................................... 15

University of Utah, *University statement: Reactor detonation bomb threat* (Sept. 22, 2022) ........................................................... 20

## INTEREST OF *AMICUS CURIAE*[1]

The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan nonprofit that defends the rights of all Americans to free speech and free thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended First Amendment rights nationwide without regard to speakers' views through public advocacy, strategic litigation, and *amicus curiae* filings in cases implicating expressive rights. *See*, *e.g.*, Brief of FIRE as *Amicus Curiae* in Support of Petitioner, *Counterman v. Colorado*, No. 22-138 (Mar. 1, 2023); Complaint, *Bushart v. Perry Cnty.*, No. 1:25-cv-01288 (W.D. Tenn. filed Dec. 17, 2025); *Reges v. Cauce*, 175 F.4th 1014 (9th Cir. 2026); *Stanford Daily Publ'g Corp. v. Rubio*, 820 F. Supp. 3d 974 (N.D. Cal. 2026); *Volokh v. James*, 148 F.4th 71 (2d Cir. 2025). And FIRE regularly participates as *amicus curiae* in this Circuit in furtherance of FIRE's nonpartisan defense of freedom of expression. *See, e.g.*, Brief of FIRE as *Amicus Curiae* in Support of Plaintiff-Appellant, *C1.G v. Siegfried*, 38 F.4th 1270 (10th Cir. 2022);

---

[1] FIRE files this *amicus curiae* brief by consent of all parties. No party's counsel has authored this brief in whole or in part, and no person other than *amicus curiae*, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief.

Brief of FIRE as *Amicus Curiae* in Support of Plaintiff-Appellant, *Peterson v. Williams*, No. 20-4059, 2022 WL 1421959 (10th Cir. May 5, 2022); Brief of FIRE as *Amicus Curiae* in support of Plaintiff-Appellant, *Hunt v. Bd. of Regents of the Univ. of N.M.*, 792 F. App'x 595 (10th Cir. 2019).

FIRE has a direct interest in the questions presented of whether the "reckless disregard" standard for "true threats" categorically unprotected by the First Amendment applies in civil contexts, which implicates the speech rights of those whom FIRE represents. That includes (but is not limited to) college and university students and faculty members who may face punishment for statements others deem threatening, though the speaker had no subjective awareness they would deem the statements so, and no conscious disregard of that risk. FIRE files this brief in support of Megan Hsieh to urge the Court to hold that the First Amendment applies in such civil contexts where state action is present, requiring evidence of a speaker's reckless disregard before speech may constitutionally face restriction or punishment.

## INTRODUCTION AND SUMMARY OF ARGUMENT

When state actors punish or chill speech as threatening, the First Amendment applies, regardless of whether the state acts in a criminal or civil context. *Amicus* FIRE knows this well from its 25 years of defending students and faculty who too often find themselves facing serious consequences for protected speech that public college and university administrators deem threatening, even when the speakers themselves had no awareness of that risk. These consequences can include suspension or expulsion (of students) or reduction of salary, suspension, or termination (of faculty). Those punishments—by state actors to whom the First Amendment undoubtedly applies—cause irreparable harm. Though university administrators cannot imprison students or faculty members, their disciplinary actions nevertheless can and do significantly and negatively alter the course of lives by punishing speech rightfully and obviously protected by the Constitution.

That is what happened in this case. Megan Hsieh suffered a mental health crisis and called the suicide-prevention hotline. During the call, she made statements to the effect that she wished her own life would end and that she wanted to expose certain administrators for the stress and

anxiety she believed they had caused her. She had no ability, desire, or plan to carry out any threats. She made no "true threats" under the First Amendment, and she lacked the requisite mental state of recklessness. She did not even direct her statements toward any administrators; rather, *the operators of the hotline* paraphrased the conversation—which Hsieh believed to be confidential—to University of Oklahoma administrators. Because of her protected speech, the university suspended her from its medical school for a year.

That punishment meted out by a state-actor university does not square with *Counterman v. Colorado*, 600 U.S. 66 (2023), in which the Supreme Court of the United States settled the standard for determining whether a speaker had the necessary mental state for communicating a "true threat," rather than, for example, engaging in mere political hyperbole or loose talk. To constitutionally punish speech as a true threat, not only must a reasonable person understand it as a threat, the speaker must recklessly disregard a substantial risk the communication would be viewed as threatening violence—that is, the speaker consciously, subjectively considered the likelihood the speech would put

the listener in fear of bodily harm and spoke anyway, despite that risk. *Id.* at 78–79.

There is good reason for drawing such a bright-line rule. A standard of reckless disregard (or the higher standard of actual knowledge) requires the speaker to have subjective awareness of a likelihood her speech would cause harm. Without that awareness, speakers would face liability for speech that was not meant to cause harm but that a listener deemed threatening, thereby chilling speech and denying us all the benefit that debate on public issues remains wide open. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (noting a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open").

There is no reason to limit that principle to criminal cases, and *Counterman* offers none. It should be obvious that in announcing a constitutional test under the First Amendment—and not, say, interpreting an element of any criminal statute—*Counterman* applies whenever the First Amendment applies. That is, *Counterman*'s standard controls whenever state action punishes or chills protected speech. And in the context of "true threats," protected speech is any speech that falls

short of the "reckless disregard" standard. In other words, even when an objectively reasonable listener deems speech threatening, but the speaker did not subjectively consider and disregard (or intend) the risk that his speech would be deemed threatening, that speech is constitutionally protected.

Whether speech is punished or chilled criminally or civilly is a meaningless distinction without constitutional significance. That some district and appellate courts have declined to resolve whether *Counterman* applies in civil contexts does not alter that reality. And the text of *Counterman* itself is the best evidence that it applies in both (all) contexts.

More good evidence is that *Counterman* relies heavily on the Supreme Court's decision in *Sullivan*, which announced the "actual malice" standard of reckless disregard or knowledge of falsity in civil defamation cases as a matter of First Amendment law. *See Counterman*, 600 U.S. at 75–82. Yet more good evidence is that Counterman encouraged the Supreme Court to recognize a distinction between criminal and civil cases in applying the "reckless disregard" standard, yet

the Court declined to do so, with some Justices noting at oral argument that the distinction makes no sense where state action is present.

FIRE's 25 years of experience defending First Amendment rights demonstrates the need for courts to explicitly recognize what *Counterman* makes obvious. Where state action punishes or chills speech—including in purely civil contexts such as student expulsions or faculty firings from public colleges or universities, but elsewhere as well—the First Amendment applies no less forcefully than in criminal cases.

## ARGUMENT

### I. *Counterman* Applies to State Action That Punishes or Chills Speech.

*Counterman* applies to civil cases involving state action for at least three reasons. First, *Counterman* announced a constitutional standard that applies whenever state action is present. Second, *Counterman* relied heavily on the constitutional "actual malice" standard announced in *Sullivan*, borrowing from Supreme Court precedent applicable in the civil context of defamation. And third, the Court declined to adopt Counterman's suggestion that it limit its holding to criminal cases, with some Justices noting at oral argument the criminal-civil distinction lacks

constitutional significance, at least where the First Amendment is concerned.

### A. *Counterman* announced a constitutional standard, not a criminal one.

The universal application of *Counterman*'s rule flows from the fact that the Court resolved the question of "whether the First Amendment still requires proof that the defendant had some subjective understanding of the threatening nature of his statements." 600 U.S. at 69. The Court held "that it does," and "that a mental state of recklessness" is the minimum required to punish speech as a "true threat" under the First Amendment. *Id.* In other words, the "State must show that the defendant consciously disregarded a substantial risk that his communications would be viewed as threatening violence." *Id.* Thus, the Court announced a constitutional standard, not a criminal one.[2]

The Court overturned Counterman's conviction because the state had not proved his subjective mental state at trial. Colorado had charged

---

[2] Even before *Counterman*, this Court read the First Amendment to require a subjective mental state for constitutionally proscribable "true threats." *See United States v. Heineman*, 767 F.3d 970, 978–79 (10th Cir. 2014); *United States v. Wheeler*, 776 F.3d 736, 740–41 (10th Cir. 2015) (reversing where district court failed to instruct jury on subjective intent to threaten).

Counterman under a state criminal statute that prohibited "repeatedly mak[ing] any form of communication with another person" in "a manner that would cause a reasonable person … to suffer serious emotional distress." *Id.* at 70 (quoting Colo. Rev. Stat. § 18-3-602(1)(c) (2022)) (cleaned up). Thus, the statute required a mental state of only negligence, and the state courts assessed Counterman's First Amendment defense under an objective, "reasonable person" standard, in error. *Id.* at 71–72.

In overturning Counterman's conviction, the Court held "the State must prove in true-threats cases that the defendant had some understanding of his statements' threatening character." *Id.* at 73. A standard of recklessness, the Court reasoned, "offers enough breathing space for protected speech, without sacrificing too many of the benefits of enforcing laws against true threats." *Id.* at 82 (citation omitted). A lesser standard, it explained, would create a "chilling effect," resulting in "self-censorship of speech that could not be prosecuted." *Id.* at 75 (citation omitted). The Court thus held only recklessness "is enough" to push expression across the line to being proscribable or punishable. *Id.* at 73.

This represents a constitutional rule under the First Amendment: For expression to be proscribable as a threat, the speaker must at

minimum consciously disregard the risk that a listener would understand the statement as a threat and deliver it anyway. In announcing this standard, the Court was not merely interpreting an element of a particular criminal statute to read *mens rea* into it, such as in *Elonis v. United States*. 575 U.S. 723, 734–40 (2015) (interpreting the federal threats statute, 18 U.S.C. § 875(c), as requiring a subjective mental state without reaching the First Amendment question). Rather, it established a rule applicable any time a state actor prohibits speech on the basis that it is threatening.

Were there any question whether the Court adopted a widely applicable constitutional standard—not a criminal one—that is put to rest by Justice Barrett, who in dissenting (joined by Justice Thomas) understood the Court announced a constitutional standard binding state actors in both the civil and criminal contexts. "[T]his case," she wrote, "is about the scope of the First Amendment, not the interpretation of a criminal statute." *Counterman*, 600 U.S. at 118 (Barrett, J., dissenting). "Accordingly," she drove home, its "holding affects the *civil* consequences for true threats just as much as it restricts criminal liability." *Id.* at 118–

19. Justice Barrett was correct, and this Court must accept *Counterman*'s charge.

### B. *Counterman* relied heavily on *Sullivan*'s reckless disregard test from civil defamation.

Further evidence that *Counterman*'s "reckless disregard" standard extends beyond the criminal context lies in its reliance on *Sullivan*'s recklessness standard and other civil defamation cases—the former of which, the Court noted, is "applicable in both civil and criminal contexts." *Counterman*, 600 U.S. at 80. In this respect, defamation law (at least as it pertains to public officials and figures), like "true threats" law after *Counterman*, requires at least reckless disregard to ensure ample breathing space for speech where the speaker "may be unsure about the side of a line on which his speech falls." *Id.* at 75. Otherwise, the speaker "may worry that the legal system will err, and count speech that is permissible as instead not." *Id.* (citing *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986)). "Or he may simply be concerned about the expense of becoming entangled in the legal system." *Id.* So, in all these instances "[t]he result is 'self-censorship' of speech that could not be proscribed—a 'cautious and restrictive exercise' of First Amendment freedoms." *Id.* (quoting *Gertz v. Robert Welch*, 418 U.S. 323, 340 (1974)).

Apropos of the point above that *Counterman* adopted a constitutional rule and not an interpretation of a criminal statute (or an element in one), it is sometimes said *Sullivan* constitutionalized the law of defamation. *See, e.g.*, *Counterman*, 600 U.S. at 105 (Thomas, J., dissenting). And though *Sullivan* arose in the context of civil defamation, it announced a constitutional rule under the First Amendment that is obviously "applicable in both civil and criminal contexts." *Counterman*, 600 U.S. at 80. The Court clearly expected the same for the true threat *mens rea* it adopted in *Counterman.*

This is further reinforced by the extent to which *Counterman* relies upon obscenity and incitement jurisprudence for the principle that the First Amendment offers some amount of "strategic protection," *id.* at 75, for speech at the borders of these categories' definitions. *Id.* at 76–77. As relevant for present purposes, in the incitement context, for example, "the First Amendment precludes punishment, *whether civil or criminal*, unless the speaker's words were 'intended' (not just likely) to produce imminent disorder." *Id.* at 76 (emphasis added and citations omitted). The same is no less true of "true threats." Likewise, "the First Amendment demands proof of a defendant's mindset to make out an

obscenity case," because punishing the distribution of obscene materials "without regard to scienter would have the collateral effect of inhibiting protected expression." *Id.* at 76–77 (citation and quotation marks omitted).

"The same reasoning" found in defamation, incitement, and obscenity contexts "counsels in favor of requiring a subjective element in a true-threats case." *Id.* at 77. That is because of "the ordinary citizen's predictable tendency to steer wide of the unlawful zone" by self-censoring. *Id.* (citation and quotation marks omitted). Whether state agents deliver civil penalties or criminal ones, the chill on speech remains. The self-censorship that results is no less predictable, nor is the constitutional injury any more permissible.

### C. *Counterman* declined to adopt petitioner's suggestion that its rule be limited to criminal statutes.

The applicability of the standard announced in *Counterman* to both criminal and civil contexts is also anchored in the Court's refusal to adopt a contrary rule. Counterman sought to overturn his prosecution under a criminal harassment statute by arguing the First Amendment requires something more than general intent to prosecute speech based on its content. In asking the Court, for effectively the first time, to announce

that as a matter of First Amendment law there is a heightened, subjective mental state necessary to make speech constitutionally proscribable as a "true threat," Counterman sought to distinguish criminal cases, in which he argued a subjective mental state was necessary, from civil cases, in which he argued it was not. That point was not well taken.

During oral argument, Justice Kagan—who authored *Counterman* for a 7–2 Court—led a rhetorical charge against petitioner's criminal-civil distinction:

> JUSTICE KAGAN: Mr. Elwood, could I take you back to the first part of Justice Gorsuch's question? Because, if your basic argument is one about First Amendment chill, I'm — I'm not exactly sure why it should make a difference that there's a criminal prosecution here as opposed to civil action. And, indeed, when we talk about libel, I think, you know, one of the first cases after *New York Times v. Sullivan* presented exactly that question, and the Court said a sanction is a sanction. Whether it's criminal or civil, it might have the same kind of chilling consequences.
>
> So, as far as I know, in past First Amendment challenges of this kind, we have not drawn that distinction, even though it might be quite a natural one.

Transcript of Oral Argument at 11:21–12:14, *Counterman v. Colorado*, 600 U.S. 66 (2023) (No. 22-138), *available at* https://perma.cc/59L3-3QFM.

Counterman suggested, "in the civil context … losing a couple days of salary … can be a significant penalty, but it's nothing like being sentenced to four and a half years in prison," but did not explain why this difference in degree of punishment should constitute a categorical difference. *Id.* at 26:15–21. Yet First Amendment law has long recognized that the deprivation of rights, even for limited periods of time, constitute irreparable harms sufficient to establish not only a cognizable constitutional injury but also entitle the plaintiff to the emergency relief of a preliminary injunction. *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976). Notably, Justice Kagan asked, "Do we have any place in our First Amendment law where we've made that distinction?" Transcript of Oral Argument at 26:22–27:13, *Counterman v. Colorado*, 600 U.S. 66 (2023) (No. 22-138). And Counterman conceded he is "not aware of a body of First Amendment case law … that talks about … the civil implications of punishing threats." *Id.* at 28:10–13.

In short, petitioner's responses were unconvincing. The Court declined to adopt his proposed criminal/civil distinction in threats cases, and there is nothing in the opinion to suggest otherwise. And the above colloquy missed at least one important context in which speech is

punished or chilled through civil means, not criminal ones: public college and university campuses, where the First Amendment applies no less forcefully than in other settings.

## II. FIRE's Experience Defending Campus Speech Demonstrates the Need for *Counterman*'s Reckless Disregard Test in Civil Cases.

FIRE's experience defending student and faculty speech since its founding in 1999 demonstrates that state officials often punish or chill speech they deem threatening, even though the speakers had no intention to make a threat. It is necessary that courts explicitly recognize what *Counterman* makes obvious—that its holding applies to civil contexts including campus disciplinary proceedings—because, in the lack of that recognition, university administrators will continue to punish and chill protected speech that does not rise to the level of a proscribable "true threat." That is what occurred in the present case, and it can be avoided in future cases only if courts make that recognition explicit.

It is well established that the First Amendment protects the expressive rights of students and faculty at public colleges and universities. "[S]tate colleges and universities are not enclaves immune from the sweep of the First Amendment." *Healy v. James*, 408 U.S. 169,

180 (1972). Indeed, there is "no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large." *Id.* That is why the Supreme Court has long recognized academic freedom as a "special concern" of the First Amendment. *Keyishian v. Bd. of Regents, State Univ. of N.Y.*, 385 U.S. 589 (1967); *see also Sweezy v. New Hampshire*, 354 U.S. 234 (1957). It is why the Supreme Court has consistently protected the "expansive freedoms of speech and thought associated with the university environment." *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003).

As the Court has made clear, its "cases leave no doubt that the First Amendment rights of speech … extend to the campuses of state universities" at least equally—if not even more keenly—than everywhere else. *Widmar v. Vincent*, 454 U.S. 263, 268–69 (1981) (citing, *inter alia*, *Healy*, 408 U.S. at 180). Application of "true threats" doctrine to the civil context of administrative university proceedings must incorporate *Counterman*'s teachings to avoid the chilling effects described above. Nevertheless, in FIRE's experience, public universities and their administrators often assert an unfounded authority to punish First

Amendment-protected expression based on a reasonable-person test for threats—the same test that *Counterman* rejected.

The instant case illustrates the point. Megan Hsieh called a purportedly confidential 988 suicide-prevention hotline during a mental health crisis. During the call, she expressed a desire to "yeet" (slang for throw) University of Oklahoma administrators "off the planet" and that she wanted a named administrator "to pay in one way or another." Am. Compl. Ex. 9. She obviously had no ability to launch the administrators at escape velocity, and she testified at an administrative hearing that she meant she wanted to expose the named administrator and cause her to lose her career and reputation. Am. Compl. ¶¶ 32–33. Despite her lack of an interest in causing bodily harm and, more to the point, her lack of subjective awareness that her purportedly confidential conversation would be taken as a threat of same, the university suspended Hsieh for one year. Cases in which FIRE intervenes follow similar trajectories.

The case of University of Utah student Meredith Miller, for example, is instructive. She commented on social media: "[I]f we don't

win today, I'm detonating the nuclear reactor on campus."[3] University police characterized Miller's obvious sports-related hyperbole as a "veiled threat," and charged her with making a "threat of terrorism" under Utah Code § 76-5-107.3.[4] A post on social media—where irreverent, caustic, and incendiary banter is the norm[5]—calling for an absurdly high gravity of harm (nuclear detonation) for a trivial reason (a loss by Utah's college football team) is an obvious joke. "The 'true' in [true threats] distinguishes what is at issue from jests, 'hyperbole,' or other statements that when taken in context do not convey a real possibility that violence will follow." *Counterman*, 600 U.S. at 74 (quoting *Watts v. United States*, 394 U.S. 705, 708 (1969)).[6] But university administrators did not take it as a joke: Though the prosecutor ultimately dropped the criminal charge,

---

[3] Letter from Alex Morey, Director, FIRE, to Sim Gill, District Attorney, Salt Lake County (Sept. 23, 2022), *available at* https://perma.cc/4J8H-G9QE.

[4] *Id.*

[5] *See generally* Lyrissa Barnett Lidsky & Linda Riedemann Norbut, *#I🔫U: Considering the Context of Online Threats*, 106 Calif. L. Rev. 1885 (2018).

[6] The university police chief justified the arrest by stating the school has "a zero-tolerance policy for these kinds of threats." University of Utah, *University statement: Reactor detonation bomb threat* (Sept. 22, 2022), *available at* https://perma.cc/6Y5G-5JDY. "Zero tolerance" is the opposite of the rule *Counterman* embraced.

Miller was forced to hire counsel to defend herself against a possible two-year suspension before a university tribunal.[7]

In another example, University of Virginia student Morgan Bettinger, driving home from work in July 2020—during which the nation was reeling from the police murder of George Floyd—came upon a street blocked by protestors. She exited her car and told the driver of a city garbage truck blocking traffic that "[i]t's a good thing you are here because, otherwise, these people would have been speed bumps."[8] This was idle chatter—a dark joke at most, not a statement of intent to commit a future act of violence. Indeed, Bettinger used the past-conditional tense. While she may have expressed contempt for the demonstrators' method of protest or their message, or displeasure at having been delayed unexpectedly, it was no true threat. Yet the student-run University Judiciary Committee found Bettinger responsible for "shameful" comments that "put members of the community at risk" and imposed

---

[7] FIRE, *University of Utah: Student Arrested, Investigated, Then Cleared for Nuclear Meltdown Joke*, *available at* https://perma.cc/L2YH-FA38.

[8] Letter from Sabrina Conza, Program Analyst, FIRE, to James E. Ryan, President, University of Virginia (July 27, 2021), *available at* https://perma.cc/8L8P-F9GQ.

sanctions, including a required apology, 50 hours of community service at an approved social justice organization, and three hours of remedial education on police-community relations.[9] The university compounded the constitutional error of punishing Bettinger by refusing to expunge her disciplinary record that resulted from her comment regarding the protestors.[10] Bettinger sued and the parties settled.[11]

In yet another example, New Jersey's Montclair State University rescinded professor Kevin Allred's employment offer after he tweeted, regarding President Trump's support of repealing the Affordable Care Act: "[T]his is all a sham. [I] wish someone would just shoot him outright."[12] The statement is remarkably similar to the statement the Supreme Court protected in *Watts v. United States*: "If they ever make me carry a rifle the first man I want to get in my sights is L.B.J." 394

---

[9] *Id.*

[10] Letter from James E. Ryan, President, University of Virginia, to Adam B. Steinbaugh, Director, FIRE (Aug. 18, 2021), *available at* https://perma.cc/MDD6-64K3.

[11] Jackie Bond, *U.Va. alumna settles First Amendment lawsuit against the University after her expulsion in abeyance*, The Cavalier Daily (Feb. 28, 2024), *available at* https://perma.cc/UX57-FX2D.

[12] Letter from Adam B. Steinbaugh, Senior Program Officer, FIRE, to Mark J. Fleming, University Counsel, Montclair State University (Aug. 4, 2017), *available at* https://perma.cc/QL48-SWRU.

U.S. at 706; *cf. Rankin v. McPherson*, 483 U.S. 378, 379–83 (1987) (holding in public employment context that statement, "If they go for him again, I hope they get him," is protected speech). This sort of "political hyperbole" may amount to a "very crude offensive method of stating political opposition to the President," *Watts*, 394 U.S. at 707–08, but it is protected speech, not a true threat.

In a similar instance, President Trump's 2018 tweet stating his intention to "declar[e] ANTIFA … a major Organization of Terror," prompted Professor Jeff Klinzman to comment on the page of a political Facebook group: "Yeah, I know who I'd clock with a bat … ."[13] Iowa's Kirkwood Community College used this statement, among others, as grounds to remove Professor Klinzman from classroom instruction, quickly leading to his resignation, based purportedly on "safety concerns."[14] FIRE represented Klinzman, who settled the matter with the college.[15]

---

[13] Letter from Adam B. Steinbaugh, Director, FIRE, to Dr. Lori Sundberg, President, Kirkwood Community College (Aug. 27, 2019), *available at* https://perma.cc/JH42-PNMG.

[14] *Id.*

[15] FIRE, *Victory: College settles with 'antifa' professor fired for criticizing President Trump on Facebook, avoids First Amendment*

As these cases demonstrate, there is real harm done to students and faculty members at public colleges and universities (as well as to others in other civil contexts implicating the First Amendment) when state actors punish or chill speech as if it were threatening though speakers had no intention of making a threat. That is what happened in the instant case to Megan Hsieh, notwithstanding what *Counterman*'s text and logic make obvious: In both criminal and civil contexts where state actors punish speech as threatening, if the First Amendment applies, so does *Counterman*'s constitutional standard.

## CONCLUSION

*Counterman*'s reckless disregard standard seeks to avoid the chilling effect of self-censorship that predictably follows from speakers avoiding penalties for speech that others find threatening, though the speaker had no intention of making a threat. From the speaker's perspective, it matters little whether those penalties come in criminal or civil forms; a penalty is a penalty, and civil penalties can and do have life-altering effects. FIRE's experience demonstrates this plainly,

---

*lawsuit from FIRE* (Apr. 27, 2020), *available at* https://perma.cc/KP25-5X7C.

including at our public colleges and universities where chilled speech necessarily results in less open and robust debate on public issues, taming discussion in the very places designed to host such debate. This Court should accordingly affirm the district court's denial of Defendants' Motion to Dismiss and denial of qualified immunity to the individual Defendants.

Dated: June 10, 2026

/s/ *Ronald G. London*

Ronald G. London
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
(215) 717-3473
ronnie.london@fire.org

Counsel for *Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f), this document contains 4,582 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 10th Cir. R. 32(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

3. All required privacy redactions have been made per 10th Cir. R. 25.5.

4. Any hard copies of the foregoing brief submitted to the Clerk of this Court are exact copies of the brief as filed via ECF.

5. A virus check of the digital submission of this brief was performed using SentinelOne Singularity, and no virus was detected.

Dated: June 10, 2026

/s/ *Ronald G. London*

Ronald G. London
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION

Counsel for *Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2026, I electronically filed a copy of the foregoing brief with the Clerk of the United States Court of Appeals for the Tenth Circuit using the Court's appellate CM/ECF system. I further certify that to the best of my knowledge, counsel for all participants are registered CM/ECF users, and service will be accomplished via the CM/ECF system.

/s/ *Ronald G. London*
Ronald G. London
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION

Counsel for *Amicus Curiae*